Story,
 
 J,
 

 delivered the opinion of the Court as follows:
 

 The Defendants not having answered to the hill in the' Court below, it has been taken
 
 pro confesso,
 
 and the cause is therefore to be decided upon thertitle and equity apparent on the face of the bill.
 

 If the Plaintiffs have shown a sufficient title to the trust property in the present bill, we have no difficulty in holding that they are entitled to the equitable relief prayed for. It will be but the case of the
 
 eestuis. que trust
 
 enforcing againát their trustees the rights ,of own-, ership under circumstances in which the objects o'f the trust would be otherwise defeated. And in our . judgment it would make no difference whether the Épiscopal church were a voluntary society, or, clothed with corporate powers ? for in equity, as to objects which the
 
 *46
 
 laws camlot but recognize, as. useful and meritorious, the same reason would exist for relief in the one case as in the other. Other considerations arising in this case, material to the title oh which relief must be founded, render an enquiry into the character and powers of the Episcopal Church, indispensable.
 

 At a very early period the religious establishment of England seems to have been adopted in the colony of Virginia,- and, of course, the common law upon that subject, so far as it was applicable to the circumstances .of that colony. The local division into parishes for ecclesiastical purposes can be very early
 
 traced;
 
 and the subsequent laws enacted for religious purposes evidently pre-suppose the existence of the Episcopal church with its general rights ami authorities growing out of the common law. What those rights and authorities are, need .not be minutely stated. It is sufficient that, among other things, the church was capable of receiving endowments of land, and that the minister of the parish was,.during his incumbency, seized of the freehold of its inheritable property, as emphatically
 
 persona ecclesiw,
 
 and capable, as a sole corporation, of transmitting that inheritance to his' successors. Th'e church wardens, also, were a corporate body clothed with authority arid guardianship over the repairs of the church, .and its personal property; and the other temporal concerns of tlie parish were submitted to a vestry composed of persons selected for that purpose. In order more effectually to cherish and support religious .institutions, and to define the authorities and rights of the Episcopal officers, the legislature, 'from time to time, enacted laws on this pqbjcct. By the statutes of 1661,
 
 ch.
 
 1, 2, 3,10,
 
 and
 
 1667,
 
 ch.
 
 3, provision was made'for the erection and repairs of churches and chapels of
 
 ease;
 
 for the laying out of glebes arid church lands, and the building of *a dwelling bouse for the
 
 minister;
 
 for the making of assessments and taxes for these and other parochial purposes^ for the appointment of church wardens to keep the church in repair, and to provide books, ornaments,
 
 &c.;
 
 and, lastly, for the election of a vestry of twelve persons by the parishioners, whose duty it was, by these and subsequent statutes, among other things, to make and proportion levies and assessments, and to purchase glebes and erect dwelling houses for
 
 *47
 
 the ministers in each respective parish. See statute 4696,
 
 ch.
 
 11 — 1727,
 
 ch. 6
 
 — and, 1748,
 
 ch.
 
 28 — 2,
 
 Tuck-: cr’s Blackst. Com. Jlppx. note M.
 

 By the operation of these statutes and the common law, the lands thus purchased became vested, either directly or beneficially, in the Episcopal church. The minister for the time being was seized of the freehold, in law or in equity,
 
 fire ecclesiai,
 
 and, during' a vacancy,
 
 the fee remained, in abeyance,
 
 and the profits of the parsonage were to be taken by the parish for their own use.
 
 Co. Lit.
 
 340,
 
 b.
 
 341, 342,
 
 b.
 
 2,
 
 Mass. 11.
 
 500.
 

 Such were some of the rights and powers of the Episcopal church at the time of the American revolution $ and under the authority thereof the purchase of the lands stated in the bill before the Court, was undoubtedly made. And the property so acquired by the church remained unimpaired, notwithstanding the revolution ; for the statute of 1776,
 
 ch.
 
 2, completely confirmed and established the rights of the church to all its lands and other property.
 

 The stat. 1784,
 
 ch.
 
 88, proceeded yet further, it expressly made the minister and vestry, and, in case of a vacancy, the' vestry of each parish, respectively, and their successors forever, a corporation by the name of the Protestant Episcopal bhurch in the parish where they respectively resided, to have, hold, use and enjoy all the glebes, churches and chapels, buryíng-groúnds, books, plate and ornaments appropriated to the use of, and every other thing the property of the late Episcopal church, to the sole use and benefit of the corporation. The same statute also, provided for the choice of new vestries, and repealed all former laws relating to vestries aiid church wardens, and to .the support of the clergy, &c. and dissolved all former vestries j and gave the corporation extensive powers as to the purchasing, holding, aliening, repairing and regulating the church property. This statute Was repealed by the statute of 1786,
 
 ch.
 
 12, with a proviso saving to all religious societies the property to them respectively belonging, and authorizing them to áppoint, from timé to time, according to the rules of their sect, trustees who should be capable of managing and applying such property to the
 
 *48
 
 religious use of such societies; and the statute of 1788,
 
 ck.
 
 47, declared that the .trustees appointed in the sfeveral parishes to take care of and manage the property of the Protestant Episcopal church, and their successors, should, to all intents and purposes, be considered as the successors to the former vestries, with the same powers of holding and managing all the property formerly vested in them. All these statutes, from that of 1776,
 
 eh.
 
 2, to that of 1788,
 
 eh.
 
 47, and several others, were repealed by the statute of 1798,
 
 eh.
 
 9, as inconsistent with the principles of the constitution and of religious freedom $ and by the statute of. 1801,
 
 eh.
 
 S, (which was passed after the district of Columbia was finally separated from the states of Maryland and Virginia) the legislature asserted their right to all the property of the Episcopal churches in the respective parishes of the
 
 state;
 
 and, among other things, directed and authorized the overseers of the poor, and their successors in each parish wherpin any glebe land was vacant or should become so, to sell the same and appropriate the proceeds to the use of the poor of the parish.
 

 It is under this last statute that the bill charges the Defendants (who are overseers of the poor of the parish of Fairfax) with claiming a title to dispose of the landi in controversy.
 

 This summary view of so much of the Virginia statutes as bears directly on the subject in controversy, presents not only a most extraordinary diversity of opinion in the legislature as to the nature and propriety of aid -in the temporal concerns of Religion, but the more embarrassing considerations of the constitutional character and efficacy of those laws touching the rights and property of the Episcopal church.
 

 It is conceded. On all sides that,, at the revolution, the' Episcopal church no longer retained its character as an exclusive religious establishment. And there cari be no doubt that it was competent to the people and to the legislature to deprive it of its superiority over other religious sects, and to withhold from it any support
 
 by-public taxation.
 
 Rut, although it may be true that “religion can be directed only, by reason and conviction, not by force or violence,’’.and that “ all men arc equal
 
 *49
 
 ly entitled to the free exercise of religion according to the dictates-of-conscience,” as the bill of rights of Virginia declares, yet it is difficult to perceive how it follows as a consequence that the legislature may not enact laws more effectually to enable all sects to accomplish the great objects of religion by giving them corporate rights for the management of their property, and the regulation of their temporal as-wcll as spiritual.concerns. Consistent with the constitution of Virginia the legislature could not create or continue a religious establishment which should have exclusive rights and prerogatives, or compel the citizens to worship under a stipulated form or discipline, or to pay taxes to, those whose creed they could not conscientiously believe. But the free exercise of religion cannot be. justly deemed to he restrained by aiding with equal attention the votaries of every sect to perform' their own religious duties, or by establishing funds for the support of ministers, for public, charities, for the endowment of churches, or for the sepulture of the dead. And that these purposes could he better secured'and cherished by corporate pdwers, cannot be doubted by any person who hás attended to the difficulties which surround all voluntary associa-. fions. While, therefore,' the legislature might exempt the citizens from a compulsive attendance arid payment of taxes in support of any particular sect, it is not perceived that either public or constitutional principles required the abolition of all religious corporations.
 

 Be, however, the general authority of the legislature as to the subject of religion, as it may, it will require other arguments to establish the position that, at the revolution^ all the public property acquired by the Episcopal churches, under the sanction of the laws, became the property of the state; Had the property thus acquired been originally granted by the state or the king,;, there might have been some color (and it would have been but a color) for suclrari extraordinary pretension. But the property was, in fact and in law, generally purchased by the parishioners, or acquired by tjie benefactions of pious donors. The title thereto was indefeasibly vested in the churches, or rather in their legal agents.- It was not in the power of the .crown to seize or assume it j nor of the parliament itself to destroy the grants, unites by the exercise of a power the most
 
 *50
 
 arbitrary* oppressive and unjust, and endured only be= cause it cpuln not be resisted; It was not
 
 forfeited; for
 
 the churches had committed no offence. The dissolution of the regal government no more destroyed the right to possess or enjoy this property than it did the right of any other corporation or individuar to his or its own property. The dissolution of the form of government did not involve in it a dissolution of civil rights, or an abolition of the common law under which the inheritances of every man in the state'were held. The state itself succeeded only to the -rights of the crown ; and* we may add, with many a flower of prerogative struck from its hands. It has been ass"rted as a principle of the common law that the division of an empire creates no forfeiture of previ >usly vested rights of property.
 
 Kelly v. Harrison,
 
 2
 
 John. c.
 
 29.
 
 Jackson v. Lunn,
 
 3
 
 John. c. 109. Calvin’s case, 7, co.
 
 27. And this principle is equ’ily c- nsonant with the common sense of mankind and the'maxims of eternal justice. Nor are we able to perceive any sound reason why the church lands escheated or devolved upon the state by the revolution any more than the property of any other corporation created by the roy al bounty or established by tbe legislature. Tbe .revolution might justly take away the public patronage, the exclusive cure of souls, and the Compulsive taxation for the support of the church. Beyond, tbes" we are not prepared to admit the justice or the authority of the exercise of legislation.
 

 it is not, however', necessary to rest this cause upon the general doctrines already asserted 5 for, admitting that, by the revolution, the church lands devolved on the State, the statute of 1776,
 
 ch.
 
 2, operated <as a new grant and confirmation thereof to the use Of the church;
 

 If the legislature possessed the authority to make such ft grant and confirmation, it is very clear to our-minds that it vested an indefeasible and irrevocable title. We have no knowledge of any authority or principle which could support the doctrine that a legislative grant is revocable-in its own nature, and held only
 
 durante bene placitOi
 
 Such a doctrine would uproot the very foundations of almost all the land titles in Virginia, and is utterly inconsistent with a great and fundamental principle of a
 
 *51
 
 republican government, the right of the citizens to the free enjoyment of their property legally acquired.
 

 It is asserted by the legislature of Virginia, in 1798 and 1801, that this statute was inconsistent with the bill of rights and constitution of that slate, and therefore void. Whatever weight such a declaration. might properly have as the opinion of wise and h atned men, as a declaration of what the lawr has been or is, it can have no decisive authority. It is, however, encountered by the opinion successively given by former legislatures from the earliest existence of the constitution itself, which were composed of men of the very first rank for talents and learning. Ami this opinion, too, is not only a extemporaneous exposition of the constitution, but has the additional weight that it was promulgated or acquiesced in by a great majority, if not the whole, of the very framers of the constitution. Without adverting, however, to the opinions on the one side or the other, for the reasons which have been already.stated, and others which we forbear to press, as they would lead to too prolix and, elementary an examination, we are of opinion that the statute of 1776,
 
 ch.
 
 2, is not inconsistent with the constitution or bill-of eights of Virginia. We are prep&rgd to go yet farther, and hold that the statutes of 1784;
 
 jih.
 
 88, and 1786,
 
 ch.
 
 37, were no infringment of any rights secured or intended to be secured under the constitution, .either civil, political, or religious.
 

 How far tlie statute of 1786;
 
 ch.
 
 12, repealing the statute of,l784,.c/¿. 88, incorporating the Episcopal churches, and the subsequent statutes in furtherance thereof of 1788,
 
 ch.
 
 47, and
 
 ch.
 
 63, were consistent with the principles of civil right or the constitution of Virginia, is a subject of much, delicacy, and perhaps not without difficulty. It is observable, however, that they reserve to the churches all their corporate property, and authorize the appointment of trustees to manage the same. A
 
 private
 
 corporation created by the legislature may loose, its fiairchises by a
 
 misuser
 
 or a
 
 nonuser
 
 of them ; and they may be resumed by the government under a judicial judgment upon a
 
 quo warranto
 
 to ascertain and enforce the forfeiture.- — This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation. Upop a. change of government, too, it may be ad
 
 *52
 
 mitted that such exclusive privileges attached to a private corporation as áre inconsistent with the new government may be abolished. In respect, also, to
 
 public
 
 corporations which exist only- for public purposes, such as counties, towns, cities, &c. the legislature may, under limitations, have a right to change, modify, enlarge or restrain them, securing however, the property for the uses iff those for whom and at whose expense it was originally purchased. But that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the state, of dispose of the same to .such purposes as they may please, without the consent or default of the corporators, we are not prepare,dto admit,* and we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and the letter of the constitution of the United States, and upon the.derisions of most respectable judicial tribunals, in resisting such a doctrine. The statutes of 1798
 
 ch.
 
 9, and of 1801,
 
 ch. B,
 
 are. not, therefore in our judgment, operative so far as to divest the Episcopal church of the property acquired, previous to the revolution, by purchase or by donation. In respect to the latter statute, there is this farther Objection, that it passed after the district of Columbia was taken under the exclusive jurisdiction of congress, and as. to the corporations and property within that district, the right of Virginia to legislate no longer existed. And as to the statute of 1798,
 
 ch.
 
 9, admitting it to have the fullest operation, it merely repeals the statutes passed respecting the church since the revolution j and, of course, it left in full force all the statutes previously enacted so far as they were not-inconsistent with the present constitution. It left, therefore, the important provisions of the statutes of *1661, 1696,1727,
 
 and
 
 1748, so far as respected the title to the church lands, in perfect vigor, With so much of the common law as attached upon these rights.
 

 Let us now advert to the title set up by the Plaintiffs in the present bill. -U /on inspecting the deed which is made a part of the bill, and. bears date in-1770, .the land appears to havp been conveyed to the grantees as church wardens of the parish of Fairfax and to their successors
 
 *53
 
 in that office, forever. It is also averred in the bill that the Plaintiffs, together with two of the Defendants (who are church wardens) are the vestry of the Protestant Episcopal chirch, commonly called the Episcopal church of Alexandria, in the parish of Fairfax, and that the purchase was made by th vestry of said parish and .church, to whom tic present vestry are the legal and regular successo; s in the said vestry
 
 ;
 
 and that the purchase w as made for the usé and beta fit of the said church in the said parish. jNo statute of-Virginia has been cited which creates church wrardehs acorporation for the pur, pose of holding lands $ and at common law their capacity wras limited to personal estate. 1
 
 B. C, 394*
 
 — Bro.
 
 Corf. 77. 84.
 
 — i
 
 ltalle Mr.
 
 393. 4',
 
 10.
 
 — Com.
 
 Big.
 
 tit.
 
 Esgliset F.
 
 3. — 12
 
 II.
 
 7, 27. 6. — 1 3
 
 H.
 
 7, 9, 6.-37
 
 H.
 
 6, 30.--Í
 
 Burn’s Eceles.
 
 Law,
 
 290.
 
 — Gibs. 215.
 

 It would seem, therefore, that the present deed did not. operate by way of
 
 grant
 
 to convey a. fee to the. church wardens and their successors$ for their successors, as such, could not take
 
 ;
 
 nor to the church wardens in their natural Capacity
 
 ;
 
 for
 
 (i
 
 heirs” is not in the deed. But the covenant of general warranty in the. deed binding the grantors and their heirs forever, and warranting the land to the church wardens and their successors forever may well operate by way of estoppel to confirm to the church and its privies the perpetual and beneficial estate in the land.
 

 One difficulty presented on the face of the bill was, that the Protestant Episcopal church of Alexandria was not directly averred to be the same corporate or unincorporate body as the church and parish of Fairfax, or the. legal successors thereto, so as to entitle them to the lands in controversy. But upon an accurate examination of the bill, it appears that tlie purchase was made by the vestry “ of the said parish and church,” s‘ for the use and heneiit of the said church in the said parish,” It must, therefore, be taken, as true that there was no other Episcopal church in the parish ; and that the property belonged to the church of Alexandria, which in this res* pect, represented the whole parish. And there can be no doubt that the Episcopal members of the parish of Fairfax have still, notwithstanding a separation ‘from the state of Virginia, the same rights and privileges as
 
 *54
 
 tliey originally possessed in relation to that church, while it was the parish church of Fairfax.
 

 The .next consideration is whether the Plaintiffs, who are vestry-men, have, as such, a right to require the lands of the church to be sold in the manner prayed 'For in the bill. Upon the supposition that no statutes passed since the revolution are in force, they may be deem' d to act under the previous statutes and the common law. By those statutes the vestry were to be appointed by the parishoners “for the making and proportioning levies and assessments, for building and repairing the churches and chapels, provision for the pool1, maintenance of the minister, and spch other necessary purposes, and for the more orderly managing ail parochial affairsout of which vestry the minister and véstry wTere yearly to choose two church wardens.
 

 As incident to their office as general guardians of the church, we think tliey must be deemed entitled to assert the rights arid interests of the church. But the minister, also having the freehold, either in law or in equity, during his incumbency, in the lands of the church, is entitled to assert his own rights as
 
 persona ecclcsioc.
 
 No alienation, therefore of the church lauds can he made either by him? self or by the parishioners or their authorized agents, without the mutual consent of both. And therefore wo should he of opinion that, upon principle, no sale ought, to be absolutely decreed, unless with the consent of the parson, if the church be full.
 

 If the statute of 1784,
 
 ch.
 
 88, be in force for any pur? pose whatsoever, it seems to us that it 'would lead to a like conclusion. If the repealing statute of 1786,
 
 ch.
 
 13 or the statute of 1788,
 
 ch.
 
 47, by which the church property was authorized to be vested in trustees chosenjiy the church, and their successors, be in force for any purpose whatsoever, then the allegation of the bill, that the Plaintiffs “ have, according to the rules and regulations of their said society, been appointed by the congregation vestry-men and trustees of the said church,” would directly apply, and authorize the Plaintiffs to institute the. present bill. Still, however, it appears to us that in case of a plenarty of the church, no alienation or sale of tlie church lands ought to take place without the
 
 *55
 
 assent of the minister, uhless such- assent be expressly dispensed with by some statute.
 

 On the whole the majority of the Court are of opinion that the land in controversy belongs to the Episcopal church of Alexandria, and has not been divested by revolution, or any act of the legislature passed since that period; that the Plaintiffs are of ability to maintain the present bill; that the overseers of tl\e poor of the parish of Fairfax have no just, legal, or equitable title to the said land, and ought to be perpetually enjoined from claiming the same; and that a sale of the said land ought, for the reasons stated in the bill, to be decreed upon the assent of the minister of said church (if any there be) being given thereto; and .that the present church way-dens and the said James "Wren ought to be decreed to convey the same to the purchaser; and the proceeds to be appiied in the manner prayed for in the bill.
 

 The decree of the Circuit Court is to be reformed so as to conform to this opinion.