Dunkin, Chancellor.
I concur in the judgment of the court, and desire to state, briefly, the reasons which have led me to this conclusion.
Whatever doubts may have been, at one time, entertained, the argument of the Circuit Judge, and the authorities *516 cited in his opinion, seem clearly to have established, that a bank is a private corporation, and that the charter creates a franchise, which may be forfeited by misuser or nonuser.
All corporations are created by the consent of the sovereign authority — in England, of the King, as expressed by Parliament; and in this country, of the People, as expressed through the Legislature. It is the duty of all corporations to act up to the end or design, whatever it be, for which they were created. And it is an implied condition of the grant, that, on failure to perform this duty, the charter may be resumed by the authority which granted it. Such was the doctrine of Lord Holt in Sir James Smith’s case in 1691; such the doctrine of Sir William Blackstone, 1 vol. ch. 18; and such the opinion of the Court of King’s Bench, in Rex vs. Passmore, 2 T. R. 513, decided in 1788.
In this conntry, the authorities are not less distinct, uniform and conclusive. “A private corporation, created by the Legislature, may lose its franchises by a misuser or non-user of them; and they may be resumed by the government under a judicial judgment, upon a quo warranto, to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation.” This is the language of Mr. Justice Story, in pronouncing the judgment of the Supreme Court of the United States, in Terrett vs. Taylor, 9 Cranch, 43. The doctrine has been repeatedly recognized by that court, as well as by Chief Justice Parsons, Chancellor Kent, and, it is believed, by every judicial authority in the Union, which has had occasion to discuss the subject. Nor is it understood that, on this point, any difference of opinion is entertained by the members of this court.
The result of the authorities, then, is, that when a corporation ceases to perform the purposes for which it was created, the charter becomes subject to forfeiture at the will of the authority which gave it existence. It is a broken contract; and the party in default has no right to complain if he ceases to enjoy the advantages of it. But, although the authority which created the charter, has a right to revoke it, it does, not follow that the right must be exec *517 cised. Reasons may exist, which would render the enforcement of an acknowledged right harsh, impolitic, and even tyrannical. The existence of the right is not the less indisputable.
If it were conceded that the act charged against tbe bank, rendered it no longer capable of fulfilling the great purposes of its creation, little doubt w’ould be entertained, by this court, of the right of the Legislature to resume the charter. Probably the only question on which a serious difference of opinion exists, is whether, by suspending specie payments in the manner charged in the declaration, the bank ceased to discharge the duties which it assumed in receiving the charter.
Duties may be expressed or implied. The court was warned, with much earnestness, against the danger of recognizing implied trusts, as they were termed. It was urged that this was a criminal prosecution, or in the nature of a criminal prosecution, and that conviction should never follow, unless the offence were plainly written in the law, and the sanction affixed. This seems to me a misapprehension. In the charter of a ferry, no clause is inserted requiring the ferryman to transport passengers; and when a religious or charitable institution is incorporated, their several duties are never defined ; but it has never been questioned that the duties and purposes of each were well understood ; were obligatory; and that, on failure to perform them, the grant might be revoked. So, if a bridge company were incorporated as such, which, instead of building or keeping a bridge, should use the charter of incorporation for the purpose of carrying on banking operations, the court would not hesitate to declare the charter forfeited, both for non-user and abuser.
And this, too, furnishes an answer to the argument, that the bank of South Carolina is not indebted to the charter for its authority to issue bills, (fee., inasmuch as the individuals composing the corporation had, for many years previously, exercised this power. The corporation is the creature of the charter. The Legislature gave existence to that, which had no existence before. The individuality of the members was lost, as well as their rights and responsibilities as such. The charter, in giving existence to *518 a new being, became the origin and source of all its powers and capacities.
It is well stated in the judgment of the Circuit Court, that “ all corporations are created on the assumption that they will subserve the general policy of the State, and be of some public advantage; that the existence of a private corporation is conditional only.” And in Dartmouth College v. Woodward, 4 Wheat. 658, Mr. Justice Washington says : “ The obligation imposed on them, and which forms the consideration of the grant, is that of acting up to the end or design for lohich they toere created by their founder.”
What was the public purpose intended to be accomplished by the creation of the banks 1 What was the obligation imposed upon them, which formed the consideration of the grant of the privileges and immunities conferred upon them, and the condition of their existence as a corporation?
The ordinary idea of a bank, is a place where the money of individuals may be safely deposited ; where loans may be effected; and the notes or bills of which may be used with greater convenience, as a substitute for gold and silver. The original charter of this bank was granted in 1801. For ten years previously, the individuals seeking the charter had conducted an institution on their individual responsibility, which effectually answered all these purposes, and enjoyed the confidence of the community. Desiring a grant from the Legislature, which would alter and limit their responsibility, which would extend their existence, and confer on them other privileges, they undertook that the corporation would continue to discharge the same duties, and would afford the same public advantages.
The constitution had already prescribed gold and silver as the only legal tender in payment of debts. This was. equally obligatory on individuals as on banks. But the ¡usage of the country had given a different character to their obligations. By these usages, and according to the general understanding of the community, the bills of banks Were redeemable on demand, in specie, at the counter of the banks. Their immediate convertibility was their great recommendation to public confidence. Unlike that of an individual, the ability of the bank might be tested in.a raopient. In consequence of this quality, their bills, payable *519 without interest, were readily received in exchange of notes payable with interest. Bank paper and money were, even judicially, regarded as convertible terms, because, in practice and in fact, bank bills could be immediately converted into gold or silver.
The Legislature had, then, a right to expect — it was an implied condition of the charter — that these characteristics of bank paper would be preserved ; that the bank would do no act, would adopt no measure, which would impair the credit of its paper, and thereby destroy its distinctive quality between that and the obligations of individuals.
Practically, it cannot be questioned that the suspension of specie payments impairs, of necessity, the credit of bank paper. The only criterion is its convertibility into gold or silver. Prior to the suspension, this is immediate, and the credit of the bank is perfect. Suspension produces a change as instantaneously as the coldness of the atmosphere causes a depression in the thermometer. Its extent will depend on a variety of circumstances — -the probable duration of the suspension — the character of the directors— public opinion as to the ultimate solvency of the institution. But the mischief is done. Their bills may, and will be, received, for the time, in payment of debts, in the ordinary transactions of life, &c., because nothing else can be obtained. It is the uniform effect of a depreciated currency, to keep out of circulation every othel medium. But such bills are not received as gold and silver, nor are they worth as much as gold and silver, or the notes of specie paying banks. They supply a currency; but the necessary effect of suspension is, that they constitute no longer a sound currency. It becomes less and less sound, the longer the depreciation continues. When the Bank of England suspended specie payment, in 1797, its bills were, at first, ata trifling discount, but before they resumed, in 1821, the bills had, at one time, depreciated to twenty-five per cent, discount; and such is the necessary fate of inconvertible bank paper.
As a place of deposit, the usefulness of the institution is, in the same manner, impaired. It has been decided, that every individal making a general deposit, is entitled to ■demand specie from the bank. So long as the bank con *520 tinues to pay specie, the confidence of the creditor is unshaken, and the bank derives all the advantage from the use of the money. Suspension of specie payments always produces panic among the depositors, if not well-grounded alarm and distrust. The rush of individuals on the banks, at some of the northern cities, on the first intelligence of suspension, afforded conclusive evidence that confidence was gone, and precipitated, if it did not produce, the common ruin of the banks and themselves. Where the institution has been long known, and the character of its officers well established, the immediate effect of suspension is less injurious; but uneasiness always exists, and confidence diminishes, as the bank continues in suspension.
So far as banks are intended to facilitate loans, and thereby accommodate the public, their usefulness and their .functions ought to cease, so soon as they suspend specie payments. In this respect, there should be no difference between banks and individuals. When, from any cause, they become unable to redeem their obligations, they should cease to extend their circulation, or, in other words, to enlarge their indebtedness. They owe it to themselves and the public, to pause, and ascertain their condition. Under an acknowledged inability to redeem in specie, their notes should be no longer exchanged with those of individuals on unequal terms. Doubtless, the banks of this State were much influenced by this principle during the period of suspension. But, if the right to suspend, and continue in suspension, be once recognized,'the temptation to over-issue becomes irresistible. This was manifested in the course pursued by the banks after the last war; and until their circulation was checked by the establishment of the United States Bank; and it is still more strongly manifested in the reckless career of the south-western banks since the suspension of 1837.
But it is said, that banks have always exercised the right, of suspending; that this must have been well known to-the Legislature who granted the original charter; and, in the language of the counsel, that “ this bank was born in suspension.” It is true, that when the Bank of South Carolina was incorporated, in 1801, the Bank of England' was in a state of suspension. On Sunday, 26th Februa *521 ry, 1797, an order of the Privy Council was issued, directing the suspension of specie payments, and on the following day this order was approved by Parliament. The bank did not resume until 1821, “presenting, during that interval,” says an eminent writer, “ a stupendous phenomenon, unparralleled in history.”
But the suspension of the Bank of England was perfectly consistent with the principle which has been assumed. The authority which granted the charter, can alone avail itself of a breach of the condition. “ The crown,” says Mr. Justice Ashurst, in Rex vs. Amery, “may elect whether it will take advantage of the forfeiture.” The suspension of 1797 was in obedience to an order in council, and with the sanction of parliament. The authority which could alone sue for the forfeiture, had directed the act to be done. In the case of the State vs. the Bank of Charleston, decided at Charleston, in February last, all the court held that the Legislature, by adopting the resolution of approval, of December, 1838, and subsequently amending the charter of the bank, had waived, or released, the forfeiture, which may have been incurred by the suspension of 1837.
So, in 1814, during the war with Great Britain, all the banks in the Middle and Southern States suspended specie payments; and, in 1837, many of them again suspended. But these were extraordinary emergencies, and the* State may well have considered that these were not fit occasions to enforce a forfeiture.
It is not denied that exigencies may arise, in which a bank, or any other corporation, may be excused for conduct which would forfeit their charter. But such excuses are not for judicial tribunals. They are properly addressed to the discretion of that authority which has entire control over the subject, and which is much more competent than a court of justice to estimate the validity of the excuse. Suspension of specie payments is always a bold, perhaps a hazardous measure — it may be one of wisdom. The Legislature, and not the banks, must be the ultimate arbiter as to the sufficiency of the cause. It is no more than a salutary check, that the State should have the power to vacate the charter, when, in their judgment, a mea *522 sure, inconsistent with the objects and design of the institution, has been adopted frivolously, or inconsiderately, or fraudulently. With this restraint, suspension of specie payments would be of rare occurrence, and might be, comparatively, harmless. Without it, the extreme medicine of life would become its daily food. It is only when the banks assume an attitude of irresponsibility, that the power becomes dangerous and alarming.
The constitution declares that no State shall emit bills of credit. Our ancestors had experienced the disastrous effects of an irredeemable paper currency. The mischief originated in the absence of any power to coerce payment, and the consequent recklessness with which-bills were issued, to the ruin of the citizen and ultimate annihilation of State credit.
But a bank which is at liberty to suspend specie payments at the discretion of the directors, has nearly equal power with a State, and; practically, is scarcely more amenable to the ordinary process of the law. The corporation may be sued; but an execution can reach only the real estate which is required for banking purposes, and, perhaps, the specie in their vaults. The indebtedness of the bank may exceed a million of dollars, and the tangible assets amount to a few thousand dollars. Debts may be •due to them to a large or a small amount; they may be good, or they may be worthless. The law affords the creditor no means of ascertaining the condition of the bank, or of rendering its assets available. It is said that this implies fraud on the part of the bank. But who shall pronounce the conduct fraudulent, because the issues of the bank vastly exceed its specie, and the debts due to it have proved comparatively worthless. Banks may continue to do business, may enlarge their circulation, for years after they have become insolvent, and the public remain in entire ignorance of their condition. The Bank of England was, for twenty-four years, in a state of virtual insolvency. The banks of the South-Western States have been in a state of suspension for the last six years, with little prospect of resumption. Their bills are depreciated from 15 to 50 per cent. Yet, these bills still circulate as *523 currency. The banks continue their operations, and will do so, in defiance of public opinion, or of any efforts of individuals to coerce them to a just discharge of their obligations. The whole section of country is inundated with bank paper, much of it as worthless as the old continental money, and with about the same power in the holders to require its redemption. The history, and the probable fate, of many of those institutions, may find a fit prototype in that of the Bank of Vincennes, reported in 1 Blackford, 267. 'For some years prior to filing the information, the bank had been in a state of absolute insolvency. Yet, during this period, it enjoyed the public confidence; was the depository of the funds of the Federal Government; issued paper to a large amount; made dividends among the stockholders, and strenuously resisted any interference or inquiry on the part of the Legislature, as an infringement of their chartered rights. It was proved, at the trial, that the indebtedness of the bank amounted to $373,000, and that it had, at the same time, “ thirty one dollars in specie, and no other available funds.” “ The idea of a banking company,” says Mr. Justice Holman, in pronouncing judgment of forfeiture, “ with a capital of a million and a half of dollars, created an indissoluble corporation for a term of twenty-one years, must be highly alarming to the community. A chartered right of acting with impunity, is derogatory to the spirit of our government; and, when connected with so much power, might be highly destructive of those equal rights guaranteed by the constitution.” This was a case of complicated fraud. But precisely the same public evils may result without the probability of proving fraud, and, perhaps, without any right to impute it. It is the consequence of great power without practical responsibility.
The only security for the public — that which will preserve to banks the confidence of the community, and perpetuate their usefulness — -is the immediate convertibility of their paper; and when, from any cause whatever, this ceases, a recognized authority in the State to vacate the charter, if in their judgment this extraordinary position was not warranted by the emergency.