275 S.E.2d 2 (1980)
STATE ex rel. the OHIO COUNTY COMMISSION
v.
Thomas C. SAMOL, As Administrator, etc.
No. 14865.
Supreme Court of Appeals of West Virginia.
Decided June 5, 1980.
Opinion Filed July 15, 1980.
Concurring Opinion October 7, 1980.
Phillips, Gardill, Hazlett & Kaiser and Paul T. Boos, Wheeling, for relator.
Jackson, Kelly, Holt & O'Farrell, James K. Brown, Lee O. Hill and Taunja Willis Miller, Charleston, for intervenor, City of Huntington. *3 Goodwin & Goodwin, Richard E. Rowe and Joseph R. Goodwin, Charleston, for amicus curiae, Jay Goldman, etal.
Hamb, Poffenbarger & Williams and John Poffenbarger, Charleston, McKittrick & Vaughan and Dennis R. Vaughan, Jr., St. Albans, Lynch, Lynch, Carr & Kabala, Ralph Lynch, Jr. and Mary Conturo, Pittsburgh, Pa., for Butcher & Singer Inc., et al.
Hutchinson & James and Paul R. Hutchinson, Jr., Beckley, for National Association of Industrial and Office Parks.
Landers P. Bonenberger, Asst. Pros. Atty., Wheeling, for respondent.
MILLER, Justice:
In this original mandamus, we are asked to determine the constitutionality of W.Va.Code, 13-2C-1 et seq., which authorizes counties and municipalities to issue revenue bonds for commercial projects. By an order entered on June 5, 1980, we declared the provision to be constitutional for the reasons to be stated in this opinion.
The relator, The Ohio County Commission, sought mandamus to compel its administrator, Thomas C. Samol, to affix his signature to $1.575 million of revenue bonds which were to be used to finance the acquisition, expansion and improvement of the Warwood Shopping Plaza located in the City of Wheeling.
Prior to the final hearing before this Court, the City of Huntington was granted leave to intervene in order to support the relator's position, since the City of Huntington was involved with a $46 million revenue bond issue to be used for financing residential real property for family units.[1]
All parties to this action recognize that in State ex rel. County Court v. Demus, 148 W.Va. 398, 135 S.E.2d 352 (1964), and State ex rel. County Court v. Bane, 148 W.Va. 392, 135 S.E.2d 349 (1964), we upheld the Industrial Development Bond Act provisions of W.Va.Code, 13-2C-1 et seq., as against a variety of constitutional attacks, stating in the single syllabus of Demus:
"Chapter 78, Acts of the Legislature, Regular Session, 1963, the `Industrial Development Bond Act', is not in contravention of Sections 1, 6 and 8 of Article X or Sections 9 and 10 of Article III of the Constitution of this State or of the Fourteenth Amendment to the Constitution of the United States."
Article X, Section 1 of the West Virginia Constitution relates to the exemption of public property from taxation. Article X, Section 6 prohibits the granting of State credit to counties and municipalities. Article X, Section 8 sets a limit on bonded indebtedness for counties and municipalities. Demus clearly established that Sections 6 and 8 were not applicable to revenue bonds authorized under W.Va.Code, 13-2C-1 et seq., since revenue bonds are not a charge or indebtedness of the issuing body in the sense that the bonds can be liquidated out of its tax revenues or other public funds. Demus also recognized that Section 1 of Article X permits an exemption of public property from taxation and, to the extent that the property involved in a revenue bond financing project is conveyed to the public body issuing the bond, the property may be exempt from taxation.[2] The argument based on Article III, Sections 9 and 10 relating to due process and equal protection was also rejected in Demus, since there was no taking of property without compensation nor any discriminatory feature in the bond mechanism.
The statutory provisions relating to the issuance of commercial revenue bonds are identical to those relating to industrial revenue bonds[3] and, therefore, Demus' constitutional *4 reasoning is applicable. The chief argument in the present case is that commercial bonds do not serve a valid public purpose, but much the same argument was advanced in our industrial revenue bond cases and was rejected by this Court.
Demus involved $1.75 million of industrial revenue bonds to be issued by the county court for the acquisition and construction of an industrial plant in Marion County. Bane involved $500,000 in revenue bonds to finance the construction of a warehouse adjacent to an existing manufacturing facility, which we found to be a proper public purpose under the terms of the Industrial Development Bond Act.
In the area of industrial development bonds, this Court has consistently sustained the issuance of such bonds, recognizing the salutary public purpose of the Act authorizing the bonds. In State ex rel. County Court v. Kemp, 151 W.Va. 349, 151 S.E.2d 680 (1966), we approved the use of industrial revenue bonds to finance the acquisition of a plant which had been built by the owner on an agreement from the county commission that it would provide revenue bond financing. The factual record was clear that the owner had constructed the facility based on that agreement and that the facility did provide additional employment in the county.
In Kemp, we answered the public purpose question by placing considerable emphasis on the legislative findings contained in W.Va.Code, 13-2C-2, which stresses the underlying public needs that give rise to the creation of this type of revenue bond:
"Section 2 thereof declares as a matter of legislative finding that the lack of employment and business opportunities in many areas of this state has created a critically adverse condition; that the development of new commercial, industrial and manufacturing plants is essential to relieve such condition; that the health, happiness, safety, right of gainful employment and general welfare will be promoted by the establishment of industrial plants; `and that the means and measures herein authorized for the promotion of industrial plants are as a matter of public policy, for the public purpose of the several counties, municipalities and the state of West Virginia.'" [151 W.Va. at 353-54, 151 S.E.2d at 683].
Absent a claim that legislative findings are irrational or have no bearing on a legitimate State purpose, they are not subject to judicial investigation. State ex rel. West Virginia Housing Development Fund v. Waterhouse, W.Va., 212 S.E.2d 724 (1974); State ex rel. West Virginia Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545 (1969);State ex rel. Appalachian Power Company v. Gainer, 149 W.Va. 740, 143 S.E.2d 351 (1965). It does not require any lengthy discussion to realize that the renovation, expansion or creation of existing or new commercial projects gives much the same economic benefit to a community as would comparable activities in the industrial area. Each serves to create or maintain employment and enhance tax revenues, and thereby operates to benefit the community and public in general.[4]
*5 Many states have some revenue bond financing mechanism whereby the bonds can be issued for funding a variety of projects designed to benefit the public, reduce unemployment and increase tax revenues. Such bonds do not impose an obligation on the issuing authority to redeem the bonds from tax revenues, but provide that the bond is to be liquidated from the proceeds of the particular venture. An overwhelming majority of courts have approved this type of revenue bond financing. Wayland v. Snapp, 232 Ark. 57, 334 S.W.2d 633 (1960); State v. County of Dade, 250 So.2d 875 (Fla.1971); Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5 (1964); Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80 (1950); LeBlanc v. Police Jury, 188 So.2d 131 (La.App.1966); City of Gaylord v. Beckett, 378 Mich. 273, 144 N.W.2d 460 (1966); State ex rel. Brennan v. Bowman, 89 Nev. 330, 512 P.2d 1321 (1973); Smiley v. Lininger, 36 Pa.Cmwlth. 169, 387 A.2d 1318 (1978); Elliott v. McNair, 250 S.C. 75, 156 S.E.2d 421 (1967); Darnell v. County of Montgomery, 202 Tenn. 560, 308 S.W.2d 373 (1957); Fairfax County Industrial Development Authority v. Coyner, 207 Va. 351, 150 S.E.2d 87 (1966).
As Kemp also indicates, further inquiry is appropriate to determine if the local project for which the revenue bonds are authorized falls within the industrial or commercial statutory classification and meets the general public purpose criteria contained in the legislative findings. In this connection, we look to the findings of the local government board issuing the bonds to determine the public relevancy of the project. As we stated in Kemp:
"The County Court of Brooke County, the petitioner herein, has made a finding that the acquisition of the spiral culvert plant, in the circumstances detailed above, would create additional employment and would, therefore, inure to the benefit of the public. This finding is clearly within the expressed legislative intent and, in the absence of fraud, collusion or bad faith, the wisdom of such finding can not be questioned. See State ex rel. County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352; LaFollette v. City of Fairmont, 138 W.Va. 517, 76 S.E.2d 572; Brouzas v. City of Morgantown, 144 W.Va. 1, 106 S.E.2d 244." [151 W.Va. at 354, 151 S.E.2d at 683].
In the present case, the record discloses that at a hearing before the Ohio County Commission on April 9, 1980, the Commission was apprised of the plans and development for the shopping center by the proposed new owner. In the Commission's resolution authorizing issuance of the revenue bonds, it was recognized that the existing facility had to be improved in order to make it more competitive with a shopping mall located across the Ohio River in the State of Ohio. The Commission specifically found that the expansion would increase employment and tax revenues. There is no assertion that these findings were made collusively or in bad faith. It appears that the findings represent a practical economic assessment of the public benefits to be derived from the project. These public interest findings, when coupled with the commercial nature of the facility, clearly bring the project within the provisions of W.Va. Code, 13-2C-1 et seq.
We, therefore, conclude that issuance of revenue bonds is required under the statute, and the writ of mandamus is issued, directing respondent to execute and affix the seal of The Ohio County Commission to the various documents involved in the product.
Writ awarded.
NEELY, Chief Justice, concurring:
I reluctantly concur in the majority opinion because the structure of the Internal Revenue Code of 1954, § 103 is an invitation to states to subsidize their own citizens competing with the citizens of other states.[1] *6 When the Federal government is indifferent about government subsidies to one group of citizens so that they can beat out another group of citizens in the open market it becomes impossible for the state courts to preserve fair rules in the economy. It should be obvious to even the most naive that all development is not for a public purpose; in a state court applying state constitutional provisions protecting property rights, a distinction is required between industrial development and commercial development. In general, commercial enterprises do not increase wealth while an industrial enterprise brings a large company payroll plus all of the secondary income induced by it. This is the first case to my knowledge in which this Court has validated the use of tax free government bonds to subsidize the interest cost on a commercial, as opposed to an industrial, project, where there is no public purpose other than aid to West Virginia citizens in a multi-state market area.
At the national level the distinction between industrial and commercial projects may not be distinct, but in state court the distinction is overwhelming. To analogize for a moment to international trade, one can say that industrial projects in West Virginia are designed to generate foreign exchange by providing export goods while commercial projects merely reallocate existing wealth. Not all commercial projects, of course, are so devoid of public purpose as to be invalid; parking garages and housing developments are examples of projects which are both in competition with private enterprise and serve a legitimate public goal. However, in order for government subsidization of any commercial project to be legitimate it is necessary to demonstrate that there is an unfulfilled need in the project market which has been determined by the political process to be so urgent that government support to the purveyors of the needed product is required to meet the demand. Traditionally housing, parking, and transportation have been included in this class. Employment (i. e., the production of wages) may also fulfill a "public purpose," when only state constitutional provisions are considered, but it is necessary to demonstrate that total employment is significantly increased. I have no quarrel with the general proposition that government may elect to use private enterprise to meet public needs, but the key there is the "public needs" requirement. State ex rel. Charleston Parking Authority v. Coghill, 156 W.Va. 877, 207 S.E.2d 113 (1973).
The Federal courts are entrusted with the duty of protecting the market sector of the economy from unfair government competition which serves no legitimate public purpose, yet they appear to have so relaxed their vigilance in this regard that any Congressional scheme to subsidize private enterprise, no matter how predatory, will be sustained. My review of the Federal Cases leads me to conclude that the so-called doctrine of "judicial restraint" is nothing more than one more result oriented standard of review and, therefore, certainly not set in stone. Eventually, when government involvement with private enterprise in circumstances totally unrelated to any public purpose becomes so pervasive that the corporate state is imminent, the Supreme Court will modify the standard of review and again restrain the enlistment of government in aid of private profit. As a West Virginia judge it is not my responsibility to protect the citizens of Pennsylvania or Ohio from government subsidized competition; that is the job of the Federal courts. It is for that reason that I believe that this Court can accept development bond issues for all industrial purposes under our State *7 Constitution; the primary market is an export market and there is no unfair competition with West Virginia industry. It is legitimate for a state judge to be parochial in this regard; the Federal courts have not directed that I apply a more restrictive rule. If, however, the Supreme Court were to order all state judges to enforce the "public purpose" doctrine, I would willingly comply, as I would with any other Federal mandate.
I consent to the result reached by the majority only because the facts of the case before us indicate that the commercial enterprise which the bond issue will subsidize is located on the border of West Virginia and Ohio. The uncontroverted argument of the relator was that this particular commercial development will enhance West Virginia's competitive position in the Wheeling metropolitan area which includes a substantial part of Ohio. The persuasive argument was made that a pristine pure reluctance by this Court to afford the West Virginia developers the advantages of County revenue bonds will not chill Ohio's willingness to authorize such brigandage. Consequently, until either the Federal courts or the Congress formulated some uniform criteria for government subsidized investment I am compelled to act in a defensive way to protect West Virginia commerce from unfair, government subsidized commerce in other states.[2] I wish, however, to be on record as opposing, as a matter of principle, the government subsidization of commerce. Obviously it is possible to make the distribution of goods more efficient and less expensive, which has a wealth generating effect. Yet if commerce is subjected to vector analysis, we will find that the wealth generation vector in any particular new enterprise applying existing technology is negligible in comparison to the reallocation vector. In general, commerce has many of the attributes of a zero sum game while industrial development, from a parochial West Virginia perspective, is capable of benefiting everyone in West Virginia without injuring anyone in West Virginia (a Paraeto optimum, in economic terms).
Over a century ago Justice Miller of the United States Supreme Court perceived this problem and found that the state is limited in its use of power to the enhancement of the general public welfare and cannot redistribute resources from one citizen to another. In Loan Association v. City of Topeka, 87 U.S. (20 Wall.) 655, 22 L.Ed. 455 (1874), the Court invalidated a municipal ordinance which authorized taxation to support the issuance of municipal bonds to assist the construction of a private bridge factory. The sole question was the authority of the Kansas Legislature to pass the enabling statute. The Court held that the tax could be levied only for a public purpose and that a contribution to the aid of any manufacturer was not such a purpose and, therefore, the statute was void.[3] In the words of Justice Miller:
To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favorite individuals to aid private enterprises and build up private fortunes, is nonetheless a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms. Loan Association, supra, 87 U.S. (20 Wall.) at 664.
As the Court recognized in Loan Association, government regulation of the economy is not impermissible per se; it is invalid only when the State has moved beyond the sphere of its own limited authority by using its power to help some citizens at the expense of others, rather than promoting genuinely *8 public purposes to benefit the citizenry as a whole. Otherwise,
[t]he merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner, are equally promoters of the public good, and equally deserving the aid of the citizens by forced contributions. No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two-thirds of the businessmen of the city or town. Loan Association, supra, 87 U.S. (20 Wall.) at 665.
The theory that governmental authority has implied limits which preserve private autonomy evolved from the American tradition of "natural law" which held that each branch of government is confined to a sphere of authority defined by the nature and function of that level and by the inherent rights of citizens. The decision in Loan Association was based in part upon such a conception of a natural economic order which had been supported by the Supreme Court since Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798) when Justice Chase in a seriatim opinion expressed his willingness to prevent a legislature from intruding upon a private contract or property right even if it were not "expressly restrained by the Constitution," because certain acts were simply violative of principles of natural justice. Justice Storey's majority opinion in Terrett v. Taylor, 13 U.S. (9 Cranch) 43, 3 L.Ed. 650 (1815) reflected that same theory when he reasoned that the Virginia Supreme Court could not divest the Episcopal Church of its property because the enabling statute violated "the fundamental laws of every free government," in addition to the "spirit and letter of the Constitution." Id. 13 U.S. (Cranch) at 52. It was this theory that Justice Miller elaborated upon in Loan Association when he observed that: "[t]here are rights in every free government beyond the control of the State," and, "[l]imitations on such [governmental] power which grow out of the essential nature of all free government." Loan Association, supra, 87 U.S. (20 Wall.) at 665.[4]
An exhaustive treatment of the historical role of the courts in protecting the free market sector of the economy from incursion by government is beyond the capacity of any concurring opinion of reasonable length.[5] The so-called Lochner[6] era (from 1897 to 1937) is well-known to lawyers and law students alike and it is not necessary to review the extent to which the Supreme Court was willing to go to protect the free market economy during that period. Commentators and law professors have sufficiently reviled the entire concept of court supervision of the economy, and there is little debate that in its excesses the Lochner era was wrong in blindly embracing empirically unworkable theories of laissez-faire economics, reinforced by the doctrine of evolution as told by Herbert Spencer. In its zeal to repudiate Lochner and its progeny, *9 however, the United States Supreme Court has probably laid the ground for a dangerous imbalance between the private and public sectors.
In abandoning Lochner, the Court moved well beyond the idea that legislatures need only demonstrate a real or substantial relation between laws and their objectives and in United States v. Carolene Products Company, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), the Court declared that it would sustain regulation in the socio-economic sphere if any state of facts either known or reasonably inferable would support the decision of the Legislature. In Williamson v. Lee Optical Company, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), the Court reached the zenith of its hands-off policy in upholding a law restricting optometry on the supposition that the Legislature decided that eyeglass prescriptions were necessary to promote health, and observed that "[t]he day is gone when this Court uses the due process clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions because they may be unwise, improvident, or out of harmony with a particular school of thought.... We emphasize again what Chief Justice Waite said in Munn v. Illinois, 94 U.S. 113, 134, 24 L.Ed. 77, `for protection against abuses by Legislatures the people must resort to the polls not to the courts.'" Id. at 488, 75 S.Ct. at 464. It is significant, however, that the Court has never wholly abandoned the position that legislatures, at least in their regulatory capacity, must always act in furtherance of public purposes that transcend the shifting of private interests through the political process. The Lochner cases have never been expressly overruled and the core of those cases does survive.
In tracing the historical role of the Court in protecting the free market sector of the economy from incursion by government it can be seen from the very first Supreme Court cases that it has been an elementary, general proposition that, even in the absence of a Constitutional prohibition, the State or its political subdivisions may not use public monies to aid individual interests. While today's schemes are more sophisticated than yesteryear's direct subsidization from tax revenues, that is essentially what occurs when tax free bonds are used for construction. One class of taxpayers operating in the free market must pay the market rate of interest because all of the interest is taxable, while the favored taxpayer, authorized to use tax free bonds for his personal purpose, need pay only a fraction of the market rate because of the tax advantage the investor receives. Government revenues are accordingly reduced when large amounts of interest are tax free. The expansion of the role of government in recent years has naturally resulted in an enlargement of the public function category; however, when taxation is used to improve the position of one private entity over another private entity, whether by direct seizure or through regulation, that regulation should be invalid. It is difficult to develop meaningful standards by which to review a bond issue, but the Court cannot continue to allow maximum legislative economic experimentation.[7]
For example, if the commercial project under consideration in the case before us had been planned for construction in Braxton County where there is no significant out-of-state competition I would be adamantly against affirming the constitutionality of a bond issue for commercial purposes. Since the West Virginia Constitution, Article 3, §§ 9 and 10 provide that *10 property shall not be taken without just compensation, I would see no way around sustaining the claim by competing businesses in an entirely West Virginia market that their private investments made at the going market rate of interest will be, for all intents and purposes, confiscated by the State if it subsidizes a new competing, commercial (rather than industrial) enterprise. When the corporate state is fully operational developers will either be successful or unsuccessful in business depending upon whether they have sufficient political influence to convince the appropriate authority to authorize revenue bond issues.
One of the preeminent pillars of our constitutional government is a separation of the private sector from the government sector for political rather than economic reasons. The definition of totalitarianism is a system which is "totally" organized by one power hierarchy, thus precluding any avenue of escape. As government intrudes itself into areas where its participation is not required by considerations of wealth redistribution at the consumer level (as in housing), capital formation, research and development (as, for example, nuclear fusion research which cannot be supported by the private sector) or export cartels, the opportunities for employment disassociated from politics diminish. When all elements of the economy are subject to government competition by subsidization, it becomes political rather than economic skill which is decisive for success.
Accordingly, while this Court is caught between the proverbial "rock and the hard place" with regard to commercial enterprises located in the cities on our borders with other states, I would point out that our decision today is not a general validation of revenue bond issues for commercial purposes but merely a validation of revenue bond issues for commercial purposes in areas where our residents engaged in commerce are competing with unfair tactics in other states. While an Act may be constitutional on its face, there are occasions in which it may be unconstitutionally applied, State ex rel. Charleston Parking Authority v. Coghill, 156 W.Va. 877, 207 S.E.2d 113 (1973), and I would say that no better application of that rule could occur than when one group of West Virginia residents seeks to enlist the aid of the State in the market sector of the economy in order to compete against another group of West Virginia residents who have undertaken all of the risks, expenses, and vexations of the market economy.
NOTES
[1] The City of Huntington did not seek to have a determination made as to the propriety of its bond issue, but sought to uphold the relator's position. We, therefore, do not express any opinion on that bond issue.
[2] In the present case, the relators as the issuing authority required the owners of the shopping mall to pay an amount equal to the appropriate real and personal property taxes in addition to the bond liquidating rental payments, such that there was no tax loss.
[3] The 1974 amendment to W.Va.Code, 13-2C-1 et seq., merely broadens the use of revenue bonds to include commercial projects. There is no dispute that a shopping center, such as is involved in the present case, is within the statutory definition of a commercial project, which is:

"[R]eal or personal property or both, including any buildings, improvements, additions, extensions, replacements, appurtenances, lands, rights in land, water rights, franchises, machinery, equipment, furnishings, landscaping, utilities, railroad spurs and sidings, parking facilities, parking wharfs, approaches and roadways or any number or combination of the foregoing necessary or desirable in connection therewith or incidental thereto and includes, without limiting the generality of the foregoing, hotels and motels and related facilities, nursing homes and other health care facilities, facilities for participatory or spectator sports, conventions or trade show facilities, airport facilities, shopping centers, office buildings, residential real property for family units, and mass commuting facilities." [W.Va.Code, 13-2C-3(a)].
[4] For a more general discussion of the public purpose question, see Mulcahy & Guszkowski, The Financing of Corporate Expansion Through Industrial Revenue Bonds, 57 Marq.L.Rev. 201 (1974); Note, The "Public Purpose" of Municipal Financing for Industrial Development, 70 Yale L.J. 789 (1961).
[1] Section 103(a)(1) of the Internal Revenue Code of 1954 provides that gross income does not include interest on the obligations of a state, a territory, or a possession of the United States, or of any political subdivision of the foregoing. Because the interest on revenue bonds of a state agency is excluded from Federal and State income taxes, the rate is generally lower than that which private borrowers pay, and this savings is generally passed on in the form of lower rentals. Furthermore, rental payments are deductible under Federal and State laws as an operating expense. By buying the bonds itself, it is possible for an industry to realize a net profit in its occupancy of the facility and a net tax savings resulting from rent deductions and receipt of nontaxable interest-income. See, Note, "The Public Purpose of Municipal Financing for Industrial Development," 70 Yale L.J. 789 (1961) and Note, 15 U.Fla.L.Rev. 262, 269-70 (1962).
[2] This area of the law may best be corrected by the Internal Revenue Service since it is their broad interpretation of Section 103 that allows private commercial developments. See, Spiegel, "Financing Private Ventures with Tax-Exempt Bonds: a Developing `Truckhole' in the Tax Law," 17 Stan.L.Rev. 224 (1965).
[3] That Justice Miller did not have an unyielding attachment to laissez-faire economics is shown by his majority opinion in the Slaughterhouse Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), in which the Supreme Court upheld Louisiana's law granting to a private corporation a 25-year monopoly to maintain slaughterhouses and stockyards in and around New Orleans.
[4] This same rationale appears in a case that originated in our own State of West Virginia, Parkersburg v. Brown, 106 U.S. 487, 1 S.Ct. 442, 27 L.Ed. 238 (1883) in which a suit was brought against the city by the holders of certain defaulted bonds to recover the principal and interest due. The bonds had been issued under an Act of the West Virginia Legislature which had authorized the city to lend its bonds to manufacturers locating in the city. This "loan" was evidenced by the manufacturer's notes to the city and secured by deed of trust on its property. The manufacturers had become bankrupt and the city had failed to enforce the deed of trust. The suit asked for a receiver to take charge of the remaining property and for a deficiency judgment against the city. Citing Topeka, supra the Court had little difficulty in holding that the enabling legislation was invalid and that the bonds were void since they had not been issued for a public purpose. Once again the Court seemed to base its decision on the unwritten but inherent limitation on any legislation and stated:

There was no provision in the Constitution of West Virginia of 1862 authorizing the levying of taxes to be used to aid private persons in conducting a private manufacturing business. This being so, the Legislature has no power to enact the Act of 1868. Parkersburg v. Brown, 106 U.S. 487, 501, 1 S.Ct. 442, 27 L.Ed. 238 (1883).
[5] I have, however, handled the subject at great length in a forthcoming book entitled, How Courts Govern America, which will be published in the fall of 1981 by Yale University Press.
[6] Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).
[7] I do not wish to enter into a protracted discussion of "public purpose" at this point since it is obviously an elastic term upon which ad hoc decisions are made. Compare, e. g. State v. F. H. Vahlsing, Inc., 147 Me. 417, 88 A.2d 144 (1952) which upheld a potato tax to be a public purpose, when the proceeds were used for the potato industry, primarily on the grounds that potato farming was central to the Maine economy while in Lingamfelter v. Brown, W.Va., 52 S.E.2d 687 (1949) a similar tax on apples for the benefit of the apple industry was held not to be a public purpose because commercial apple production was not large enough in West Virginia to impress it with a public interest. For a definition of public purpose see, State ex rel. City of Charleston v. Coghill, 156 W.Va. 877, 207 S.E.2d 113 (1973).