# WINTER TERM, 1859. 589

Gregory's executrix vs. Trustees of Shelby College, &c.

CASE 59—PETITION EQUITY—FEBRUARY 11.

# Gregory's executrix vs. Trustees of Shelby College, &c.

### APPEAL FROM SHELBY CIRCUIT COURT.

1. Where all the managers named in an act granting a lottery privilege have died, other persons may be appointed by the court to act as managers.

2. See the opinion for the terms of the act granting a lottery privilege for the benefit of Shelby college, the provisions of a contract by which the managers sold said privilege, and the reasons given by the court for holding the sale to be invalid.

3. Where a sale of a lottery privilege is made by agents or managers under an authority conferred by the legislature, that authority must be strictly pursued; and if departed from, no acquiescence of the parties to the contract, or the parties interested, can render it valid.

4. Purchaser of a lottery franchise under an invalid contract which conferred on him no right thereto, is not entitled to have the consideration refunded that was paid by him under the contract, where he received the benefit of the contract, and realized all the advantages from it that he would have done had it been legal and valid.

5. The grant by the legislature of a privilege to raise money by a lottery is a mere gratuity. It is not an act of incorporation; it confers no chartered rights, nor does it amount to a contract. The power of the legislature to repeal the grant, and thereby to withdraw the privilege, where no rights have been acquired under the act by which it was created, nor any liability incurred in consequence of its passage, is clear and unquestionable. But where vested rights have been acquired under the grant before the passage of the repealing law, then, to the extent of such rights, such repealing law must be regarded as unconstitutional and inoperative.

6. Before an act of the legislature repealing lottery privileges in this State was passed, W. had, on the faith of a lottery grant to Shelby college, advanced large sums of money, which were appropriated by him for the benefit of the college; and the trustees of the college had mortgaged to him their rights under the lottery franchise for his indemnity. Held—That W. had a vested right to the use of the grant until from such use the sum was produced which he had advanced for the benefit of the college prior to the passage of the repealing act; and that so far as the repealing statute interferes with or affects this right, it is unconstitutional and inoperative.

G. A. & I. CALDWELL, and JAMES SPEED, for appellant, cited *Perchard vs. Heywood*, 8 *Term Rep.*; 2 *Black. Com.*, 345; *Smith's Com. on Stat. and Cons. Law*, pp. 630, 659, 927–8; 1 *Term Rep.*, 93; note; *Broom's Com. on the Com. Law*, 516–17–18–19, side pp.; 8 *Bingham*, 181; 5 *Cranch*, 22; *Smith's Commentaries*, pp. 713, 739–40–41–42–43–44, 913, et seq.; *Addison on Contracts*, 2d Am. ed., side p. 1158; *Chitty on Contracts*, 763; 1 *H. Blackstone*, 322;

8 *Term Rep.*, 89 ; 4 *Greenleaf's Rep.*, 513 ; 2 *Dana*, 78 ; 4 *Denio*, 399 ; 3 *Binney*, 72–3 ; 10 *Peters*, 532 *to* 564 ; 2 *Humphreys*, 367.

T. B. & J. B. COCHRAN, on same side, cited *Smith's Selected Cases*, 5th *Amer. ed.*, vol. 2, p. 619, *and authorities cited; Ib., pp.* 642, 643.

BROWN & WHITAKER, THOS. N. LINDSEY, WM. C. BULLOCK, and T. J. THROOP, for appellees, cited *Session Acts* 1835–6, *p.* 374 ; *Sess. Acts* 1839–40, *p.* 182 ; *Sess. Acts* 1840–1, *p.* 132 ; *Sess. Acts* 1837–8, *p.* 115 ; *Angell & Ames on Corp., sec.* 291 ; 3 *East*, 410 ; *Sugden on Powers*, 212, 213, 214 ; *Hill on Trustees*, 463, 464 ; 1 *Story's Eq. Jur., sec.* 333 ; 2 *Parsons on Contracts*, 511–12, 571 ; 3 *H. & McH.*, 324 ; *Ib.*, 205 ; 2 *Sch. & Lef.*, 341, 348 ; 13 *B. Mon.*, 402 ; *Rev. Stat., sec.* 6, *p.* 271 ; 4 *Wheaton*, 518 ; 4 *Littell*, 47 ; 7 *B. Mon.*, 168 ; 5 *Dana*, 336 ; 6 *Barr*, 86 ; 9 *Missouri Rep.*, 389 ; *Ib.*, 507.; 4 *Gil.*, 221 ; 13 *S. & M.*, 645 ; 15 *B. Mon.*, 642 ; 3 *T. R.*, 17 ; 16 *Ohio Rep.*, 599.

THOS. A. MARSHALL, WM. F. BULLOCK, and BODLEY & PINDELL, on same side, cited 8 *Howard's Rep., U. S.*, 169 ; 1 *Rob. Va.*, 713 ; 7 *Dana.*, 8 ; *Hill on Trustees*, 284, 477, 485, 495 ; *Story's Equity, secs.* 750, 769, 751 ; 5 *Mad. R.*, 438 ; *Civil Code, sec.* 153 ; *Ang. & Ames on Corp.*, 299 ; 22 *Pick.*, 24.

CHIEF JUSTICE SIMPSON DELIVERED THE OPINION OF THE COURT:

In February, 1836, an act was passed by the legislature, granting to certain persons therein named, and their successors, collegiate powers and privileges, under the corporate name of the " Trustees of Shelby College."

At the next ensuing session of the legislature an act was passed for the benefit of the Shelby college, which act is in the following language :

" § 1. *Be it enacted by the General Assembly of the Commonwealth of Kentucky,* That it shall and may be lawful for James Bradshaw, Samuel Tevis, John Lane, James F. Moore, and Henry Radford, to raise by way of lottery, in one or more classes, as to them may seem expedient, any sum not exceeding one hundred thousand dollars, to be appropriated for the use and benefit of the Shelby college ; and the said managers, or such of them as may think proper to act, shall, before they enter upon the duties assigned by this act, enter into bond, in the county court

of Shelby, in the penalty of one hundred thousand dollars, conditioned for a faithful discharge of the duties enjoined on them by this act; and said bond may be sued on in the name of the commonwealth of Kentucky, for the use and benefit of any person or persons injured by a breach of the conditions of said bond; and it shall be the duty of said managers, within ninety days after the drawing of said lottery, or any class thereof, to pay or cause to be paid to the fortunate person or persons holding the ticket or tickets, all such prize or prizes as may be due agreeably to the scheme which they, the said managers, may agree upon and publish: *Provided, however*, That such scheme shall not reserve more than twenty per cent.; said managers shall have the right to appoint a clerk or clerks, and any other officer necessary to conduct said lottery; all of whom, before they enter upon the respective duties assigned them by the managers, shall take an oath, before some justice of the peace, faithfully and honestly to discharge the same.

"§ 2. *Be it further enacted*, That the said managers shall, within ninety days after the drawing of said lottery, or any class thereof, pay over to the trustees of the Shelby college all sums of money which may be due, in consequence of the drawing of said lottery, after all prizes shall have been paid.

"§ 3. *Be it further enacted*, That the said managers shall be, and they are hereby, authorized to sell and dispose of the *scheme*, or any class or classes of said lottery, to any person or persons, who shall enter into bond with good security, conditioned well and faithfully to comply with all the terms and conditions of this act, payable to the commonwealth of Kentucky; which bond or bonds shall be received by said managers, and be by them filed in said Shelby county court before said lottery, or any class or classes thereof, shall be drawn: *And provided, also*, That such sale or sales shall not be made of any class or classes for less than ten per cent. on the amount proposed to be drawn: *Provided further*, That nothing in this act contained shall be so construed as to repeal any provision of the general law of this commonwealth against selling or vending lottery tickets within this State."

This last proviso in the third section of the act was repealed at the next session of the legislature.

Three of the persons named in the first section of the act, viz : Samuel Tevis, James Bradshaw, and John Lane, concluded to act as managers, and executed bond in conformity with the provisions of the statute.

Samuel Tevis having died, James Bradshaw and John Lane, as surviving managers of this lottery privilege, made two contracts with Walter Gregory. By the first contract it was stipulated that Gregory should pay to said managers the sum of two thousand dollars per annum, in consideration of an agreement upon their part not to sell or dispose of said lottery privilege, nor to use it themselves ; and by the second contract he agreed to pay them the sum of one thousand dollars annually in consideration of a similar agreement on their part.

Other contracts were subsequently entered into between Walter Gregory and John Lane, in reference to this lottery grant, but as these contracts were made during the lifetime of James Bradshaw, the other manager, and were not concurred in by him, they will not be further noticed or considered in this opinion.

Bradshaw died in August, 1849, and after his death, viz : in October, 1849, John Lane, as surviving manager, and Walter Gregory made a contract, by which, for the sum of one thousand dollars per annum to be paid by Gregory, until the sum of eighty-eight thousand dollars should be realized by such annual payments of one thousand dollars, " John Lane agreed to sell, dispose, assign and set over to, and appoint the said Walter Gregory, sole manager and conductor of said lottery or lotteries,.and transfer to him the sole right to draw such scheme or schemes of lotteries, by virtue of the above entitled acts, as he shall from time to time deem proper, at any place within the Commonwealth of Kentucky, or to determine any class of said lottery, by the drawing of any lottery out of the Commonwealth of Kentucky, if he shall deem it advisable," &c.

After the death of all the persons who were named as managers in the act granting said lottery privilege, William I. Waller, claiming to be entitled to the benefits resulting therefrom, brought this action for the purpose of having other persons appointed as managers, to control and dispose of the

privilege and render it profitable. He made Gregory a party to his action, controverted the validity of the contract he had made with Lane as surviving manager, and sought to have it vacated and annulled.

During the pendency of the action, Gregory having died, it was revived against his executrix. Other persons were appointed to act as managers, and the court below having decided that the contract between Lane and Gregory, bearing date in October, 1849, was invalid, the executrix of Gregory has appealed to this court.

On a previous appeal by the same party, this court decided, that as all the original managers had died, the appointment of other persons to act as managers was proper.

Although several previous contracts had been made with Gregory, yet as he alleged in his answer that they had been all canceled by him, in pursuance of a right therein reserved, and the contract of October, 1849, was the only one relied upon by him, and by its terms all previous contracts between the parties were expressly vacated and rescinded, the other contracts need not be noticed on this appeal, but it is only necessary to inquire into the validity of the one last made, under which a right to the lottery grant is claimed by the appellant.

The validity of that contract is contested principally on two grounds.

*First.* That Lane, as surviving manager, had no power or authority to make any contract concerning the lottery.

*Second.* That the contract relied upon by the appellant was not authorized by the act of the legislature, by which the grant was conferred, nor made in conformity with its provisions.

As we regard the contract invalid for the reasons contained in the second ground, we deem it unnecessary to determine whether Lane, as the surviving manager, had power to dispose of the lottery privilege or not; for conceding his authority to do it, still, he could only do it in the manner prescribed by the act, and in strict conformity with its requirements.

Under the first section of the act, it was the duty of the managers to determine the sum they intended to raise by the

VOL. 2—75.

lottery, which sum was not to exceed one hundred thousand dollars. They were then to adopt a plan, or scheme, to raise the sum thus determined upon; in which scheme they were permitted to reserve such a per cent. on the amount drawn as they might deem proper, not exceeding, however, twenty per cent. on that amount. The whole scheme would necessarily embrace several classes; and, therefore, the managers were required by the second section of the act to pay over to the trustees of Shelby College, within ninety days after the drawing of the lottery, or any *class* thereof, all sums of money which might be due in consequence of such drawing.

By the third section, the managers were authorized to sell and dispose of the whole scheme, or any class or classes of said lottery; but with the express restriction that such sale should not be made of any class or classes for less than ten per cent. on the amount proposed to be drawn.

As the whole scheme was to be constituted of various classes, the restriction thus imposed by the act applied as well to a sale of the whole scheme as to one or more of its classes. The object of such a restriction is perfectly manifest. The legislature intended thereby to limit the amount to be drawn by requiring the payment of at least ten per cent. thereon, and thus to confine the operation of the lottery privilege within reasonable boundaries.

Now, the contract in question was not made for the purpose of selling to Gregory a *scheme*, or any class or classes of said lottery, but for the purpose of selling to him the entire lottery privilege, and constituting him the sole manager and conductor thereof, with power to adopt any scheme he might deem proper.

The act did not confer upon the managers the power to constitute other managers to control the privilege thereby granted, or to make a sale of the entire grant. They had no power to sell until they first devised and adopted a scheme to raise the sum determined upon by them. They could then sell the scheme thus adopted, or any class or classes thereof, by requiring the payment of at least ten per cent. on the amount proposed to be drawn. Until the scheme was adopted, it was impossible to make a sale upon the terms required by the stat-

ute. The conclusion is therefore inevitable that no valid sale could be made until a scheme had been prepared and adopted by the managers.

The managers did not agree upon any scheme; and in the sale made to Gregory, he was not required to pay ten per cent. on the amount proposed to be drawn by him. He was to pay one thousand dollars per annum, so long as he thought proper to retain and make use of the lottery privilege. He could abandon the contract at any time, upon giving six months' notice of such intention, and paying all money due at the period of abandonment. He had it thus in his power, according to the terms of the contract, to draw to the amount of one hundred thousand dollars, or any other amount he might deem proper, each and every year, by paying the sum of one thousand dollars only.

The obvious intention of the legislature, and the true spirit and meaning of the act, were violated by such a contract. The sum to be raised by the lottery was limited by the act, and could not be exceeded. If the scheme, or a part thereof, was sold, the price at which the sale was to be made was limited, and could not be diminished. It was thus made apparent that the legislature intended to place the exercise of this lottery privilege under reasonable and proper restrictions, and to require that the sum proposed to be raised by it should be realized by the drawing of as small an amount as was consistent with the accomplishment of that object.

It is said, however, that the trustees of Shelby College, and Waller, who claims to be the beneficiary of the lottery privilege, have acquiesced in the contract of 1849, and availed themselves of its advantages from the time it was executed until this action was commenced, and, therefore, should not now be permitted to repudiate or annul it.

In answer to this argument, it is only necessary to remark, that the contract in question is not governed by the same rules that apply to contracts which are made by individuals concerning their own private matters; but being made by agents or managers under an authority conferred by the legislature, that authority must be strictly pursued; and if departed from, such

departure can only be ratified by the same body from which the authority emanated. No acquiescence of the parties to the contract can in such a case render it valid, it being unauthorized by the statute under which it was professedly made. It was absolutely void; and being improvident, injurious to the charity, and repugnant to the legislative intention apparent in the body of the act, must be treated and regarded as utterly invalid and unobligatory on the parties.

The general and uniform construction of a statute may be looked to in giving an interpretation to any ambiguous provision it contains; but when, as in this case, its provisions are clear and express, and are not involved in any ambiguity or uncertainty, the construction which it may have received is wholly immaterial, and cannot be resorted to for the purpose of ascertaining its true meaning. The construction, therefore, which the present managers have given to the act, in the contract which they have made with France, is wholly unimportant, as the validity of that contract is not a matter for our investigation on this appeal. Nor is the construction given to it by the original managers at all material, inasmuch as its plain and obvious meaning cannot be altered or modified by their action under it. They may have exceeded their authority, and their right to do so may have been acquiesced in by the parties who were interested; but their acquiescence could not have the effect of legalizing acts which in themselves were unauthorized and void. The only effect it could have would be to render such acts binding upon them so long as their acquiescence continued, and until they evinced a determination no longer to be bound by them.

Other objections have been made to the contract under consideration besides the two first mentioned; but we do not deem it necessary to notice them, inasmuch as, for the reasons already mentioned, it must be regarded as not only wholly unauthorized by the statute, but as being in direct violation of its manifest spirit and policy.

As Gregory's purchase of the lottery franchise was invalid, and conferred on him no right thereto, a claim is asserted by his executrix to have the consideration refunded that was paid

by him under the contract. But as he received the benefit of the contract, and realized all the advantages from it, until the present managers were appointed, that he would have done had it been legal and valid, there is no equity in this claim, nor any good reason why the consideration thus paid should be refunded. From the time he was deprived by the act of the present managers of the benefit of the contract, he was entitled to the consideration which had been paid in advance, and it was required by the judgment of the court below to be refunded to his executrix, and to this extent relief was properly granted; but if the lottery grant was still in existence, and had not been repealed, his executrix, for the reason just stated, was not entitled to any further relief.

If, however, the grant was repealed, and in consequence thereof he derived no benefit from the contract, after the repealing act took effect, then, the consideration upon which the money was paid having failed, he had a right to have it refunded, and the relief afforded the appellent by the judgment of the court below was less than that to which she was entitled. This renders it necessary for us to decide the constitutional question, with respect to the power of the legislature, under the circumstances which existed in this case, to repeal the act by which the lottery grant was created.

It was provided by the Revised Statutes, (*page* 271,) that, at the expiration of three years after the revision took effect, all rights and privileges which had been granted by the legislature of this commonwealth to raise money by lottery for any purpose should cease and determine.

The grant of a privilege to raise money by a lottery is a mere gratuity. It is not an act of incorporation; it confers no chartered rights, nor does it amount to a contract. The power of the legislature to repeal the grant, and thereby to withdraw the privilege, where no rights have been acquired under the act by which it was created, nor any liability incurred in consequence of its passage, is therefore clear and unquestionable.

It was said by this court in the case of *Covington and Lexington Railroad Company vs. Kenton County Court*, (12 *B. Mon.*,

147,) "that it cannot be denied the legislature possesses the power and the right to take away by statute what has been given by statute, unless rights have vested under the law before its repeal. If the legislature delegate an authority, it can certainly be revoked before the power has been exercised in such a manner as to create a vested right." "A repeal of a statute necessarily terminates all proceedings under that statute, unless rights have accrued under it which cannot be legally divested." It was, therefore, held in that case that the legislature had the power to repeal an act amending the charter of the railroad company, by which a mere privilege only was conferred, and that the repealing act having been passed before any rights had been acquired under the amendment, it was not unconstitutional.

Although, therefore, the legislature has the power to repeal the grant of a lottery privilege, where no rights have accrued under it; and though lotteries have a demoralizing tendency, and exercise a very pernicious influence over the ignorant and credulous part of the community, and for this reason have been almost universally denounced by the law-making power in the different States of the Union, yet if rights have been acquired, or liabilities incurred, upon the faith of the privilege conferred by the grant, it would be obviously unjust to permit such rights to be divested by a legislative revocation of the privilege. If, therefore, any vested rights have been acquired, under the present grant, before the passage of the repealing law, then, to the extent of such rights at least, that law must be regarded as unconstitutional and inoperative. This conclusion is, we think, fully sanctioned by the following adjudged cases: *Dartmouth College vs. Woodward*, 4 *Wheaton*, 518, 643; *Fletcher vs. Peck*, 9 *Cranch*, 88; *University of Maryland vs. Williams*, 9 *Gill & Johnson*, 365; *Terret vs. Taylor*, 9 *Cranch*, 52; *City of Louisville vs. University of Louisville*, 15 *B. Mon.*, 642, 692.

The plaintiff, Waller, before the repealing act was passed, had, on the faith of the lottery grant, advanced large sums of money, which were appropriated by him for the benefit of Shelby College, and the trustees of the college had mortgaged to him their rights under the lottery franchise for his indemnity.

As the lottery privilege was granted for the benefit of the Shelby College, and the money was advanced by Waller with the assent of the trustees of the college, under the belief that it would be realized eventually from the lottery, he became thereby invested with a right to the use of the grant, until from such use the sum was produced which he had advanced for the benefit of the college. This was a vested right of which he could not be divested by an act of the legislature. So far, therefore, as the repealing statute interferes with or affects this right, it is unconstitutional and inoperative. But as the lottery privilege is only saved from the operation of the repealing act by the existence of this right, and to the extent thereof, it follows as a necessary consequence that the grant has been repealed, except so far as it may be needed for the purpose of raising the sums of money which Waller had advanced for the benefit of the college before the passage of the act. When-ever that object shall have been accomplished, the right to use the privilege will have then ceased and determined.

As, therefore, the lottery grant was not entirely repealed by the provision in the Revised Statutes, but the privilege might still have been used for the purpose of raising the amount due to Waller, the appellant, for the reasons before mentioned, was not entitled to any further relief than that which she obtained by the judgment of the court below.

Wherefore, said judgment is affirmed.