No. 3278.—STATE ex rel. HERNANDEZ *v.* B. F. FLANDERS, Mayor, et al.

A law will not be declared unconstitutional unless it be clearly so.

The decisions by the Legislature of a question of public policy will not be revised by the courts.

There is a wide difference between the funds and franchises of a political corporation and those of a private person.

The charter of a municipal corporation is not a contract (but a mandate) and the Legislature has the right to regulate and control the corporation and its funds and franchises, because the whole interest and franchises are given for the public use and advantage. 5 An. 661.

By section forty of the act of 1870, chartering the city of New Orleans, the city was directed to fund its floating debt, and by the act No. 103 of 1871 it was directed to include in the statement thereof all registered certificates and bills issued or approved (under the former charter) by the chairmen of the "Committees of Finance" and registered by the Controller or his deputy, which at the time of presentation for payment or redemption as part of the floating debt were held and owned by *bona fide* purchasers for value; and such holders were authorized to enforce their rights in this regard by mandamus, and pending proceedings by mandamus were confirmed.

It appearing that the relator was the *bona fide* holder for value of a certificate of this sort, signed by the chairmen, who had the legal authority to *sign it*, and duly registered, and that as to this particular certificate there was no sufficient proof of fraud as between the committees and the parties to whom it was originally issued. Held—That the legislation quoted above cured any informalities prior to such signing and issuance; that the question whether the *bona fide* purchaser of the certificate should suffer, or the city should pay a claim thus certified by her proper officers, was one of public policy within the legislative discretion, and that the relator was therefore entitled to a mandamus.

APPEAL from the Eighth District Court, parish of Orleans. *Dibble, J. Semmes & Mott,* for relator. *George S. Lacey,* for respondents.

HOWE, J. The relator asked for a mandamus to compel the Mayor, the Administrator of Finance and the Administrator of Public Accounts of New Orleans to place on the statement of the floating debt of the city a certificate of indebtedness, in accordance with section forty of the city charter of 1870. Laws of 1870, extra session, p. 46.

The certificate in question was purchased by relator in open market at the market rate, and presumably in good faith. It is as follows:

"FINANCE COMMITTEES,

City Hall, New Orleans, January 10, 1870.

The Controller is hereby authorized to warrant on the Treasurer, in favor of John Coleman & Co., for the sum of four thousand one hun-

dred and thirty-one 16-100 dollars, and charge the same to account of contingent, in accordance with resolution No. 1467.

No. 264.        (Signed)                    VICTOR PRADOS,
                                            W. H. PEMBERTON,
                                        Chairmen Finance Committees.

Registered March 1, 1870.
                (Signed)                    PAS. LABARRE,
                                                Deputy Controller.
                (Indorsed)              JOHN COLEMAN & CO."

The resolution No. 1467 thus referred to was dated May 19, 1867, and provided an extra compensation of twenty-five per cent. to Coleman & Co. for paving Rampart street, under their unfinished contract of May 9, 1860, giving as a reason that the price of materials had been enhanced in this rate by the war.

The respondents allege several causes why the mandamus should not issue, which we will notice in their order:

*First*—That the proceeding against them by mandamus was prohibited by the act of March 17, 1870. This prohibition appears, however, to have been removed by the act of May 2, 1871, hereinafter quoted, and does not seem to be further relied on by counsel for the defense.

*Second*—That the resolution 1467 referred to in the certificate was void as giving a gratuity and in contravention of the city charter in force at the time.

This point refers, we understand, to the question of authority in the Common Council to pass the ordinance. To this the relator replies that if the Common Council was without power to pass the ordinance this defect has been remedied by the provisions of section forty of the city charter of 1870 and by the act of May 2, 1871, laws of 1871, No. 103, which refers specifically to the class of certificates to which the one in suit belongs. The latter law is entitled "An act defining the obligations of the city of New Orleans to be redeemed as part of the floating debt under the provisions of section forty, act No. 7, approved sixteenth March, 1870, and to enforce the same," and reads as follows:

"That section forty of act No. 7, approved sixteenth of March, 1870, embraces and was intended to embrace as obligations of the city of New Orleans all registered certificates or bills issued or approved by the chairmen of the committees of finance and registered by the Controller of the city of New Orleans, or his deputy, which at the time of presentation for payment or redemption as part of the floating debt were held and owned by *bona fide* purchasers for value, and it is hereby made the duty of the Administrator of Public Accounts, the Mayor and Administrator of Finance to place all such registered cer-

tificates or bills on the statement of the floating debt, and in case of refusal, the holders of said registered certificates or bills are hereby authorized to proceed by writ of mandamus to enforce the duty herein imposed on the officers aforesaid.

"*Be it further enacted, etc.*, That this act shall take effect from and after its passage, and any proceeding by mandamus or otherwise heretofore taken by holders of said obligations are hereby confirmed."

We think the case is with the relator on this point. It seems to have been believed by the Legislature that the former municipal authorities had contracted a floating debt; that certificates of this indebtedness had been thrown on the market and purchased by *bona fide* holders; that good faith and public policy required that such holders should be paid, and that it was better that some claims made by doubtful authority should be settled than that the credit of the city should suffer. We apprehend that the effect of this legislation was to supply the want of power in the city and in the officers who signed the certificates, if any such want existed.

*Third*—That the certificate in suit can not be recognized as of any legal force because, first, it is not embraced in the resolution No. 1467; because, second, the amount of the twenty-five per cent. allowance was not certified by the City Surveyor and approved by the chairmen of the Committees of Streets and Landings; and because, third, the work had never been measured by the City Surveyor.

The certificate, on its face, is issued under the resolution 1467; it is in regular form; and we do not think the reasons thus urged under the third subdivision of the answer furnish any defense to this proceeding in the face of the legislation above quoted. As already suggested that legislation must have proceeded on the theory and for the purpose of sustaining the credit of the city by protecting the *bona fide* purchasers of the certificates emitted by its officers, in customary form, even though issued without the prescribed preliminary formalities.

*Fourth*—The respondents further answered that a great fraud upon the city was sought to be consummated at the time the certificates, including the one in question, were issued to Coleman & Co.; that there was, in fact, an over issue of certificates under the resolution to the amount of about $20,000 by the then chairmen of the Finance Committees.

The evidence certainly shows that the business of these Finance Committees was conducted in a grossly irregular way, but it hardly amounts to a showing that the certificate in controversy was itself fraudulent in its inception. But at any rate we are of opinion that the legislation above cited disposes of the case in favor of the relator. Certificates of indebtedness issued by a former city government were afloat; some were in the hands of *bona fide* holders, but were subject

to the imputation of irregularity or even graver objections. The question whether the *bona fide* purchaser should suffer or whether the city should bear the burden saddled upon it by a former administration, was a question purely of public policy. As such it belonged to the political department of the government, and the decision of that department should not be reversed by the judiciary. We can not perceive that the acts quoted are in conflict with the Constitution, and it is, therefore, in our opinion, the duty of the courts to enforce them by the process prescribed.

The judgment of the lower court in favor of relator should, therefore, be affirmed.

Judgment affirmed.

Wyly, J., being absent, took no part in this decision.

---

## ON REHEARING.

Howe, J.  A rehearing having been granted in this case and an oral argument made, we have had it under advisement for some time and given it a careful examination, but we are unable to change the views heretofore expressed.

The certificate of indebtedness upon which the proceeding is brought is genuine; it is duly signed by Prados and Pemberton, chairmen of finance committees, who were authorized by law to sign such documents, and registered by P. Labarre, Deputy Controller, and there is nothing to show that it was a fraud, whatever irregularities there may have been in the other dealings of Coleman & Co. with the committees. The relator is admitted to have bought it in good faith, and he therefore is entitled to his mandamus under the act of 1871, No. 103. We can not find that this act is unconstitutional, and we can not refuse to obey it simply because we may not think it a wise law. Our views of public policy, like those of other citizens, may be expressed at the ballot box, but we have no right, as judges, to enforce them by a decree of court.

The fact that legislative power may be abused, is no argument against its existence; and it has been long settled in this State, as well as in American jurisprudence generally, that a law will not be declared unconstitutional unless it be clearly so. Indeed, in the earlier days of the Republic, the right of courts to declare any law unconstitutional was gravely doubted.

It is in vain to argue such a case as this by analogies drawn from the rights of private individuals. Analogies are proverbially deceptive, and there is a wide difference between the funds and franchises of a private person and those of a political corporation. A public, and

especially a municipal corporation, is created for a political purpose. 2 Kent, 275. It is invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and is subject to the control of the Legislature of the State. 2 Kent, 275. When it holds specific property for municipal purposes, that property is said by some to be invested with the security of private rights, but in most other respects the State, through the Legislature, has full control. "If the corporation be public in the strict sense," says Mr. Kent (vol. 2, 301), "the government has the sole right as trustee of the public interest, to inspect, regulate, control and direct the corporation and its funds and franchises, because the whole interest and franchises are given for the public use and advantage."

"In respect to public or municipal corporations, which exist only for public purposes, as counties, cities and towns, the Legislature, under proper limitations, have a right to change, modify, enlarge, restrain or destroy them, securing, however, the property for the use of those for whom it was purchased." 2 Kent, 305.

"A public corporation instituted for purposes connected with the administration of the government may be controlled by the Legislature, because such a corporation is not a contract within the purview of the Constitution of the United States. In those public corporations there is in reality but one party, and the trustees or governors of the corporation are merely trustees for the public."

These principles, stated nearly fifty years ago by Mr. Kent as the better opinion of the American courts, were adopted to the fullest extent by the Supreme Court of Louisiana at least a quarter of a century ago (3 An. 306, 1 An. 162, 5 An. 665, 11 An. 54, 1 An. 438), and nothing could be plainer and broader than the views expressed in this regard by the court through Mr. Justice Preston in the case of Police Jury v. Shreveport, 5 An. 661, in the year 1850. Every argument as to unconstitutionality made in this case was made in that and in the cases to which the organ of the court referred, but without avail. We are at a loss to perceive any good reason why we should ignore this well settled jurisprudence, and usurp a sort of general superintending control over the Legislature in these matters.

Our predecessors, as early as the year 1813, disclaimed such a power even over inferior courts, (3 M. 42), and surely it ought not to be hinted at as existing with regard to a co-ordinate branch of the government.

It is therefore ordered that the judgment heretofore rendered by us remain undisturbed.

———

Howell, J., *dissenting.* My first reason for not concurring in the opinion of the court in this case, after further examination, is that the instrument on which the proceeding is based is not strictly a "regis-

tered certificate," as is usually understood by such words.   It is simply an authorization to the Controller to draw a warrant on the Treasurer for a specific sum under a particular ordinance.   The Administrator of Public Accounts, who occupies the position of the Controller under the former charter, testifies that it is not what is properly termed a "registered certificate;" and the facts of this case show the importance and necessity of adhering strictly to legal forms.   Secondly, if it be viewed as a registered certificate, in the contemplation of section forty of the present city charter, it is not a legal obligation of the city, having been issued without consideration, without legal authority, and in violation of the good faith of the alleged payees, as plighted in a notarial act signed by them and the Mayor of the city, in special reference to this very matter.

The record shows clearly, by the contractors' own list of their alleged losses, that it was issued as a gratuity or bonus on a contract for paving Esplanade street, and as stated on its face by virtue of ordinance 1467, which by its terms and the express construction thereof by the contractors in the notarial act above referred to, limited the gratuity or bonus to the paving of a part of Rampart street.

The manner and circumstances of its issuance, and that of others like it, are unusual and not warranted by any provisions of the law and ordinances relating to the subject.   A recital of them here need not be made.   Suffice it to say, the Finance Committees evaded any action themselves, although frequently pressed, and the chairmen seem to have left it to their secretary to prepare the documents and ascertain from some other employé in the City Hall the particular ordinance under which they could be issued, and then affixed their official signatures, for reasons which are not legitimate.

But my most serious objection relates to the act No. 103 of 1871, which I can not think has made this a valid obligation of the city, and imposed on us the duty of ordering the defendants to acknowledge it as such.   This act is entitled "An act defining the obligations of the city of New Orleans to be redeemed as a part of the floating debt, under the provisions of section 40 of act No. 7, approved March 16, 1870, and to enforce the same," and it declares that said section embraces, and was intended to embrace, as obligations of the city, all registered certificates or bills issued or approved by the Chairmen of the Committees of Finance, and registered by the Controller of the city or his deputy, which at the time of its presentation for payment or redemption as part of the floating debt were held and owned by *bona fide* purchasers for value, and it authorizes the writ of mandamus to compel the officers, who are the defendants, to place the same on the statement of the floating debt, and specially confirms any proceeding by mandamus theretofore taken by holders of said obligations.

The proceeding in this case was then pending, and the last clause discloses the motive of the act, while the record shows that the relator is the holder of other "obligations" of the same kind. In this proceeding, thus *confirmed* by an act of the Legislature while it was pending in the lower court, the question of the validity, the consideration, the good faith, the very existence of the alleged "obligation" was then at issue, and it becomes a matter of very grave inquiry whether or not the Legislature can thus forestall judicial action and decide upon the rights of litigants, if it be contended that the document before us is embraced within the above act.

I assume it as indisputable that when the relator, Hernandez, acquired the *instrument* in controversy, for I can not call it a "registered certificate or bill," he acquired only the rights of the alleged payees, Coleman & Co., and theirs being contested as not well founded, his were no better; and I affirm that the questions, whether or not they are well founded, whether or not there is an existing obligation, and how it is evidenced, are judicial questions which the Legislature is incompetent to determine. Indeed, the question was presented to and pending before a court of justice by the voluntary action of the relator himself, and I am unfamiliar with that principle of government or justice which authorizes the legislative department to take jurisdiction of and decide disputes properly pending in the judicial, a co-ordinate department of the government, and order the latter to execute those decisions. Although the express inhibition of interference does not exist as a separate clause in the present Constitution, yet its force and power just as clearly exist in the decision or distribution of the powers of government made as if expressed. See Titles II, III, IV. That the Legislature *in its sphere* is supreme, save as restricted by the Constitutions of the State and United States, I need not deny; but I maintain that its *sphere* is only that of *legislation*, and for the purposes enunciated in the preamble to the Constitution, and that the whole Constitution, taken together, contains, besides specific prohibitions, distinct limitations upon the action of the Legislature, which are prohibitory in their nature and effect. The vesting of the judicial power of the government in certain courts is a prohibition to the Legislature of the exercise of any such power. The Legislature may make, modify and repeal laws, but in doing so it can not take from any person the rights he may have acquired under a particular law; nor can it assume the duties and powers of the judicial department, and decree or adjudge how the law shall be administered in relation to a particular right. The duty of interpreting the laws made by the Legislature belongs to the judicial department, and it is that alone which has authority to examine and decide when a civil obligation has been incurred or violated, and give the judgment necessary

in the premises. All this is fundamental. See 11 R. 414. Now, the alleged rights and obligations involved in this controversy, if any exist, spring from the contract between the city and Coleman & Co. for the paving of certain streets, and it is for the courts to determine whether there is an obligation on the part of the city to pay the sum sought to be secured in this proceeding.

It is true the corporation of New Orleans, a municipal corporation, is the creature of the Legislature, and subject, in the words of Mr. Kent, "*under proper limitations*," to be changed, modified, enlarged, restrained or destroyed by the Legislature; yet, as a creature, it is endowed with a volition, a will, which it alone can exercise. It can make contracts, incur obligations, possess property, provide or raise means or revenue; under the formalities prescribed by the Legislature. But having once exercised these powers, its rights and liabilities, in case of dispute or controversy, are to be determined by the judiciary. In case of dissolution even the Legislature is bound to "secure the property for the uses of those for whom it was acquired." 2 Kent 305; 9 Cranch 52; Greenleaf's Ev. § 331; 4 Scammon 269. The Legislature may ratify or authorize the corporation to ratify acts done and contracts entered into by its officials without proper authority or the observance of prescribed forms; but it can not compel the corporation to acknowledge and pay what it does not owe, nor can it enrich an individual at the expense of the corporate funds. Such acts are mere spoliation. It may, as it has done, provide for the manner of liquidating the obligations of the city, and direct how means may be raised for finally paying them, but it can not determine what are obligations, nor legalize a fraud.

In my opinion, it is our duty to designate as unconstitutional (8 An. 149) whatever in act 103 of 1871 may be considered as establishing conclusively the validity of all certificates or other evidences of debt, whether fraudulent or not, issued by the Chairmen of the Finance Committees and registered by the Controller or his deputy, and compelling the defendants, without the right of contesting their correctness, to place them on the statement of the floating debt, and as making in the hands of the relator, Hernandez, a legal obligation, what had no valid existence in the hands of Coleman & Co. Hernandez, by well established rules of law and equity, took the instrument in question at his own risk, and no statute can, by retroactive effect, increase his rights against the city. Art. 110 Constitution.

It is not so much the want of the observance of prescribed formalities in the issuance of this document, as it is its reality, its validity, its cause that is involved. An obligation without a cause is void, and the Legislature can not make it valid by subsequent enactment. Nor do I think the legal principles drawn from the authorities cited in

support of the relator's demand, sustain the doctrine on which alone it can be allowed. The control which those authorities recognize in the Legislature over a municipal corporation, does not extend·to the arbitrary appropriation of the funds of the corporation to private advantage, nor to the exercise of judicial powers, nor yet to compelling the acknowledgment and payment by a municipal corporation of what is not due, with the view as a public plea to preserve its credit, a measure which must, in my opinion, produce the opposite effect.

But, to conclude, I think act'103 of 1871 may be construed, without doing violence to its words, to apply only to certificates and bills, issued without proper form and authority, but for a real, valid consideration, and to authorize the writ of mandamus against the city officials in regard to them. The construction given to it in behalf of the relator, makes the courts the mere instruments of the Legislature to do what I am constrained to designate a public, dangerous wrong.

WYLY, J., *dissenting.* In the outset I deem it proper to inquire into the character of the claim which the relator seeks by process of the court to compel the defendants to place on the statement of the floating debt of the city of New Orleans. Is it a valid obligation, or is it a fraudulent claim, for which the city is not liable? From the evidence, I have no doubt that it was a palpable fraud from the beginning; that it was never contracted by the city of New Orleans or any one authorized by it, and that the city received no consideration whatever therefor, and is not bound, either in law or equity, to pay it. What are the facts?

On the nineteenth day of May, 1869, Coleman & Co. obtained from the Common Council of New Orleans the approval of resolution No. 1467, N. S., giving to them twenty-five per cent. additional upon the city's share of the contract price for paving Rampart street from Common to Esplanade; or, in dollars and cents, the sum of $37,125 78. Such relief was bestowed upon the express understanding that Coleman & Co. should present no further claim for a gratuity, and particularly no claim for a bonus on the Esplanade street contract. With a view to obtain the twenty-five per centum on the Rampart street contract, Coleman & Co. executed a notarial act, containing a clear and distinct disclaimer on their part of any right or pretension to twenty-five per cent. additional, except upon the city's share of the contract price for paving Rampart street.

Notwithstanding these facts, the Chairmen of the Joint Committees of the Board of Aldermen and Assistant Aldermen issued fifteen certificates of indebtedness, amounting to $57,815 33—an excess of $20,729 85 over the sum allowed by the resolution of the Common

66    SUPREME COURT OF LOUISIANA,

State ex rel. Hernandez v. Flanders, Mayor, et al.

Council. Among the certificates thus issued in excess was the one which forms the basis of the present proceeding, and that certificate is clearly shown by the evidence 'not to have been issued upon the Rampart street contract, in conformity with the resolution of the Common Council and the act executed by Coleman & Co., but upon the Esplanade street contract, in direct opposition to such resolution and specific agreement.

Here Coleman & Co., having several paving contracts with the city, obtained the gratuity mentioned in resolution No. 1467 upon the express condition "that the increase of twenty-five per cent. to be paid by the city shall apply only in the case of the Rampart street contract." And to remove all doubt as to the understanding upon which the ordinance was passed, the Mayor required Coleman & Co., in a notarial act, to renounce and relinquish all claims they might have for an "increase of twenty-five per cent. upon each and every one of the several contracts which the said firm now have with the city of New Orleans for the paving of various streets with square blocks, saving and excepting, however, the one for Rampart street from Canal to Esplanade street, to which contract only shall such twenty-five per cent. apply;" and moreover they bind themselves and heirs "at all times to acknowledge the force and validity of the relinquishment, and to admit and sustain the intent and meaning of said resolution." * * *

In the face of the condition stipulated in resolution No. 1467, and in the face of their solemn pledges in the notarial act, Coleman & Co. obtained from the Chairmen of the Finance Committees the certificate or order for $4131 16 upon which this suit is based, which certificate or order was not issued upon the Rampart street contract, but upon the Esplanade street contract, and which order bore upon its face the false statement that it was issued in accordance with resolution No. 1467. Here the Chairmen of the Committees of Finance and Coleman & Co., the payees of the order, deliberately conspired to perpetrate a fraud upon the city to the amount of $4131 16, and attempted to cover it by placing the false statement upon the face of the certificate that it was issued under resolution No. 1467, when, in truth, it was issued fraudulently and falsely, and contrary to the provision of said resolution. In the face of all this, the counsel for the relator asserts that this certificate was not fraudulent in its inception. I have never seen a clearer and more infamous fraud exposed in a court of justice. There is no proof, however, that the relator, the transferree, participated in or was privy to the fraud out of which arose the claim which he now demands shall be placed on the statement of the floating debt of the city of New Orleans. This may be so, but it gives him no legal or natual obligation against the city. His remedy is against his fraudulent transferrers, Coleman & Co. Prados and Pemberton had no

authority to issue this certificate as Chairmen of the Finance Committees; the resolution mentioned in the face thereof did not authorize it, and it is well settled that paper issued by unauthorized agents is not binding on their principal, it matters not in whose hands it may fall. No transfer can vitalize such an absolute nullity, or even impose on the city of New Orleans a natural obligation to pay the innocent transferree, if such he may be called, who purchased the certificate with the statement on its face that it issued in accordance with resolution No. 1467.

In the case of the Louisiana State Bank *v.* The Orleans Navigation Company et al., 3 An. 301, where the question was whether the city of New Orleans was bound by its indorsement of the bonds of the Orleans Navigation Company, there being no question as to whether the city had authorized the said indorsement, this court, through Chief Justice Eustis, its organ, said : " It would seem to be evident and reasonable that where the indorsement is by an agent and a person nôt acting in his own right, and there is a direct reference in the body of the instrument to the procuration or authority under which the indorsement is made, a person who holds the instrument by virtue of the indorsement is charged with notice of the power under which it is made. We must therefore consider the plaintiffs cognizant of the resolutions of the City Council of the twenty-ninth of July and the fifth of August, and that the right to recover depends on the validity of those resolutions and the acts done in virtue of them."

Here the validity of resolution No. 1467 is not questioned, but the relator must be held, under the settled jurisprudence of this State, to be cognizant of the fact that this certificate for $4131 16 issued in violation of the express provision of that resolution, because he is charged with notice of the limited power conferred by it on the Chairmen of the Committees of Finance, and because he is charged with notice of the acts done by virtue of said resolution. Here the agents of New Orleans held power to allow Coleman & Co. the extra compensation of twenty-five per cent. on the Rampart street contract, but could not allow it on any other contract. Having notice of the resolution No. 1467, the relator had knowledge also of the limitation imposed therein. He therefore occupies no better legal position before the court than the perpetrator of the fraud would occupy, because, under the jurisprudence of this State, he is charged with notice thereof.

On the tenth of October, 1870, the relator instituted this suit to compel by mandamus the Mayor, the Administrator of Public Accounts and the Administrator of Finance to do what they refused to do, to wit, to place this fraudulent claim, held by the relator, on the statement of the floating debt of the city of New Orleans, which he insists was their duty by virtue of section 40 of the act rechartering the city, being act No. 7 of the extra session of 1870.

We have lately held, in the case of Monasterio, that the section of the statute referred to does not require these officers of the city to place these false and fraudulent claims, such as the one held by the relator, in the "full and correct statement of all the mature obligations of the city," which it declares "shall be prepared by the Administrator of Public Accounts and by him attested under oath, and which shall be further approved by the Mayor and the Administrator of Finance;" * * * that in the meaning of the law only valid claims are to be embraced in that statement, otherwise the law would not require it to be "attested under oath" by the Administrator of Public Accounts, and also to "be further approved by the Mayor and the Administrator of Finance;" that if all claims, whether false or valid, were intended to be put on that statement, it would be useless to prepare it with so much caution, and it would be unreasonable to require these officers to swear to be correct and approve of claims which they know to be false and dishonest.

On the authority, therefore, of the State ex rel. Monasterio against these same defendants, a case directly in point where the question was carefully examined by this court, the defendants herein, in my opinion, were right in declining to put this false claim on the statement of the mature obligations of the city.

But the relator contends that his claim, whether valid or not, is covered by act No. 103, approved second of May, 1871, amending section forty of the charter of 1870. This amendment declares that said section forty "embraces and was intended to embrace, as obligations of the city of New Orleans, all registered certificates or bills issued or approved by the chairmen of the Committees of Finance and registered by the Controller of the city of New Orleans or his deputy, which at the time of presentation for payment or redemption as part of the floating debt were held and owned by *bona fide* purchasers for value." * * * * * * * *

If this act be regarded as a legislative interpretation of section forty of the charter of 1870, it can not be accepted, because it appertains to the judicial and not to the legislative department to interpret laws. 23 An. 225; 3 Howard 546. Construing both statutes together, as they ought to be, I maintain that the only fair and reasonable interpretation is, they do not cover false and dishonest claims like the one held by the relator; that although within the letter they are not within the meaning of the law.

Section forty of the city charter requires to be placed on the statement of the floating debt "all the mature obligations of the city at the date of the passage of this act, to wit: all final judgments, warrants, registered certificates and unredeemed city notes," and this amendment says that section forty was intended also to embrace "all

registered certificates or bills issued or approved by the Chairmen of the Committees of Finance and registered by the Controller of the city or his deputy." * * * * * * *

Now, although section forty declares that "all judgments, warrants, registered certificates," etc., shall be embraced in the statement of the floating debt of New Orleans, this court held in Monasterio's case that it did not cover the certificate presented by Monasterio, unless that certificate was found to be a valid debt of the city. The amendment extending the provision of section forty to embrace "all registered certificates issued by the Chairmen of the Finance Committees," in like manner ought to be construed to embrace only honest claims or certificates issued by the Finance Committees.

Under resolution No. 1467 valid certificates were issued by the Chairmen of the Finance Committees to the amount of $37,125 78, and false and fraudulent ones to the amount of $20,729 85.

Although both classes of these certificates fall within the letter of the statute amending section forty, to my mind it is only the valid certificates that are within its meaning. This is the only just interpretation that can be placed upon this legislation without casting reproach upon its authors, because it would be impossible for honest men deliberately to enact a law compelling anyone to pay a false or fraudulent claim or a claim against good conscience.

Charity, at least to the Legislature, a co-ordinate department, demands the construction that false and dishonest claims were not intended to be embraced in the meaning of the statute, although they fall within its letter.

In all civilized countries law is held to promote honesty, to condemn fraud and to protect the people from spoliation and violence, and it can not fairly be presumed that the authors of the statute before us intended to ignore these beneficient motives solely for the purpose of rewarding the fraud perpetrated by Coleman & Co.

"Juris praecepta sunt: honesté vivere, altrum non laedre, suum cuique tribure."

But the relator contends that his claim, whether valid or not, was intended to be embraced in the statute, and the motive of the lawgiver was to promote the credit of New Orleans; that it was a measure of policy adopted by the political department of the State and it is the duty of the court to enforce it. This is a fallacy so transparent that it will not for a moment stand the test of scrutiny.

How is the credit of New Orleans to be advanced by driving it from the protection of the courts, and compelling it to be burdened with debts which it never contracted, and which in no wise inured to its benefit or advantage? Would the credit of an individual be promoted if he were compelled to pay every false claim that might be

trumped up against him? If his property be the common pledge of his creditors, would their confidence be enhanced by a statute placing that pledge within the grasp of every dishonest person?

In justice to the intelligence of the Legislature, I maintain they did not intend the payment of the fraudulent claim held by the relator as a measure or policy to advance the credit of New Orleans. But the position that the Legislature intended the payment of such claims as a measure of policy, is a bald assertion. There is nothing in the statute or its preamble to justify such a purpose. The title of the act is not an act to promote the credit of New Orleans, not an act to bestow a gratuity upon Hernandez, but "an act defining the obligations of the city of New Orleans to be redeemed as part of the floating debt, under the provisions of section 40, act No. 7, approved sixteenth March, 1870, and to enforce the same." The whole purpose of the original act and its amendment was to provide *for the redemption of certain mature obligations of the city*, by requiring them to be placed, in the manner indicated, on the statement of the floating debt, for which funds of the city were to be issued, under section 41 of the charter of 1870. The false and fraudulent certificate of the relator is *not a mature obligation* of the city; and, in my opinion, it does not fall within the meaning of section 40, as amended by act No. 103 of the acts of 1871, especially when that section is read as interpreted in the Monasterio case, and in connection with section 41 of the city charter of 1870. But assuming that it was the purpose of the Legislature to compel New Orleans to pay this fraudulent claim, I maintain it is not in their power to do so; that the grant to legislate does not embrace authority to plunder the citizens; that private property can not be taken for private purpose; that the Legislature can not take the property of A to give it to B; that it has not authority to take $4131 16 from the city treasury for the purpose of bestowing a liberality upon the relator, Hernandez, to whom the city is not bound either by a legal or natural obligation; and that as it can not take the money now in the treasury, it can not compel the city to issue its bonds ·for the amount payable at a future day.

If private property can not be taken for private purposes at one time, it can not at another, because the taking is absolutely prohibited at any time.

"In respect to public or municipal corporations, which exist only for public purposes, as counties, cities and towns, the Legislature, *under proper limitations*, have the right to change, modify, enlarge, restrain or destroy them, *securing, however, the property for the use of those for whom it was purchased.*" 2 Kent 305.

Notwithstanding the power of the Legislature over these public corporations, their private property is protected. Story on the Constitution, section 1393.

State ex rel. Hernandez v. Flanders, Mayor, et al.

The same author in section 1399 says: "Whether, indeed, independently of the Constitution of the United States, the nature of republican and free governments does not necessarily impose some restraints upon legislative power, has been much discussed. It seems to be the general opinion, fortified by a strong current of judicial opinion, that since the American revolution no State government can be presumed to possess the transcendental sovereignty, to take away vested rights of property; to take the property of A and transfer it to B by mere legislative act. That government can scarcely be deemed to be free where the rights of property are left solely dependent upon a legislative body without any restraint.

"The fundamental maxims of a free government seem to require that the rights of personal liberty and private property shall be held sacred. At least no court of justice in this country would be warranted in assuming that any State Legislature possessed a power to violate and disregard them, or that such a power, so repugnant to the common principles of justice and civil liberty, lurked under any general grant of legislative authority, or ought to be implied from any general expression of the will of the people in the usual forms of the constitutional delegation of power. The people can not be presumed to part with rights so vital to their security and well being without very strong and positive declarations to that effect." See also Wilkins v. Leland, 2 Pet. 627, 657; Satterlee v. Mathewson, 2 Pet. 380, 412, 413, and also Fletcher v. Peck, 6 Cranch 67, 134.

"Under our form of government the Legislature is not supreme. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. Like other departments of the government it can only exercise such powers as have been delegated to it, and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the State who exceeds his jurisdiction, are utterly void." 4 Hill 144.

"The nature and end of legislative power will limit the exercise of it. * * * There are certain vital principles in our free republican government which will determine and overrule an apparent and flagrant abuse of legislative power, such as to authorize manifest injustice by positive laws, or take away that security for personal liberty or private property, for the protection whereof the government was established." * * * 3 Dalas 386.

"The Legislature has not, by the right of eminent domain, the right to take the property of a person to give to another, not even in police regulations." 3 Paige, Chan. N. Y. Rep. 159; 8 Wendell 85; see also 18 Wendell 56, 61, 63; Cooley on Limitations 487; 21 Penn. 147.

Authority upon authority might be added in support of the position that the Legislature has not the right to take the money or bonds of

New Orleans and bestow them, as a gratuity, upon the relator, Hernandez; but I think enough has already been adduced to settle the question beyond doubt. I can not, however, refrain from adding the following quotation from Chief Justice Marshall, in which I entirely concur, viz:

"We can not resist the conclusion that it would be a violation of the general tenure and spirit of the Constitution for the Legislature to attempt to deprive any citizen of his property without previously providing compensation therefor. And whenever such acts are passed, we believe it to be the duty of the judiciary to disregard them and consider them as nullities. We can not perceive any reason which shall compel the judiciary to obey a legislative act at war with the tenor of the Constitution and the fundamental principles for the preservation of which the government was instituted, that would not apply with equal force to produce obedience to a legislative act directly opposed to any one of the positive inhibitions of the Constitution. We grant the representatives of the people are the shepherds of the flock, but they are not exclusively such, although vested with great and extensive powers. If through inadvertence or design they should endeavor to sacrifice any one or more as victims, it can not be done so long as the judiciary remain virtuous, intelligent and independent. Both departments must concur to work iniquity before the people can be made to mourn, and in bitterness to curse their government."

In conclusion, I therefore maintain that the Legislature has not the authority to compel New Orleans to bestow its bonds for $4131 16 upon Hernandez as a gratuity. I can not call the fraudulent certificate he holds a debt of the city. I do not believe that act No. 103 of the acts of 1871, amending section 40 of the charter of the city, ought to be construed to embrace this false claim, because its title does not justify the purpose, and because the evident object of the lawgiver was not to bestow a gratuity, but to provide for the redemption of certain mature obligations of the city by issuing its bonds; and no other fair interpretation can be put upon sections 40 and 41 of the charter of 1870. I see no reason why the lawgiver should intend the city to issue its bonds to redeem the fraudulent certificates issued by the Chairmen of the Committees of Finance. We have held, in Monasterio's case, that such was not intended in regard to the fraudulent certificates issued by the city itself. Now, if it would improve the credit of New Orleans to pay the fraudulent certificates issued by its agents, the Chairmen of the Finance Committees, why would it not have the same effect to pay fraudulent certificates issued erroneously by itself? If it will improve the credit of New Orleans to pay the claim of Hernandez, why would not the payment of Monasterio have the same effect, whether his claim be valid or not?

This court has said to Monasterio, holding a registered certificate of the city, your claim ought not to be paid if it be fraudulent, as the defendants aver, notwithstanding section 40 declares that *all* registered certificates of the city shall be put on the statement of the floating debt. It now says to Hernandez, your fraudulent certificate issued by the Chairmen of the Finance Committees ought to be paid, simply because the amendment of section 40 declares that "all registered certificates or bills issued or approved by the Chairmen of the Committees of Finance," shall be placed on the statement of the floating debt.

How the payment of fraudulent certificates issued by its agents can improve the credit of New Orleans, more than the payment of fraudulent certificates erroneously issued by itself, I can not imagine. Indeed, the whole theory that the payment of such claims was intended by the Legislature as a policy to advance the credit of New Orleans, is the most palpable legal absurdity I have ever heard advanced in a court of justice.

For the reasons stated, I deem it my duty to dissent in this case.