### LORILLARD *v.* CLYDE *et al.*

*(Superior Court of New York City, Trial Term.   March 28, 1891.)*

CONTRACTS—FAILURE TO PERFORM—ACT OF PARTY.

>   Plaintiff and defendants, the owners, respectively, of two competing steam-ship lines, entered into an agreement for the consolidation of the two lines in a corporation.   The property of each party to the contract was put into the corporation at an agreed valuation, and stock issued therefor.   The agreement also provided that defendants should have the management of the corporation, and that they should guaranty to plaintiff a dividend of not less than 7 per cent. per annum for seven years, and defendants were to receive a certain per cent. on all freight carried. Afterwards plaintiff caused a suit to be brought by the attorney general against the corporation, organized in pursuance of the agreement, in which a receiver was appointed, and the corporation was dissolved.   Plaintiff did not rescind the agreement, or bring any action calculated to terminate it.   *Held,* that the dissolution of the corporation did not relieve defendants from their guaranty that plaintiff should be paid the annual "dividends" for seven years on the amount of his stock, and the fact that plaintiff was joined as a plaintiff with the people in the dissolution proceedings was immaterial.

Action by Jacob Lorillard against William P. Clyde and another for money alleged to be due under a contract.   The plaintiff and defendants were engaged in the business of transporting freight between New York and Philadelphia.   The plaintiff owned what was called the "outside" line, and the defendants ran what was known as the "inside" route.   They were competing for trade, a course detrimental to both.   The parties came together, and, on May 5, 1874, entered into an agreement in writing for the purpose of consolidating the conflicting interests, and uniting their capital under one management, a scheme supposed to be mutually beneficial.   It provided for the consolidation of the two lines in a corporation to be formed under the laws of the state, with a capital of $300,000.   The property put in by Lorillard was valued at $170,000.   That contributed by the defendants was rated at $130,000.   The parties were to take stock to the extent of their respective interests, and the defendants were to purchase $20,000 of Lorillard's stock, which would bring that held by him down to $150,000, and increase that possessed by them to an equal amount.   The arrangement was carried out, corporation formed, the property conveyed to it, and stock issued and transferred in the manner stated.   The agreement further provided that the defendants should have the management of the corporation and business, and that they should guaranty to the plaintiff a dividend of not less than 7 per cent. per annum for seven years.   The agreement went into effect July 1, 1874.   The defendants were to receive for their management the usual commission of 2½ per cent. in and 5 per cent. out on the freight carried, and it was agreed that the management of the line should be in good faith, and as economical as consistent with the interests of the business.   The defendants have, by force of judgments and otherwise, paid the agreed 7 per cent. up to the 1st day of July, 1879.   The present action is to recover the so-called dividends from that time until July 1, 1881, when the time for their payment, according to the terms of the contract, expired.

The main defense urged by the defendants is contained in the twelfth paragraph of their amended answer, as follows:   "That the consideration for which they entered into the covenant to guaranty to the plaintiff a dividend of not less than 7 per cent. per annum, for seven years, upon the capital stock held by the plaintiff, was the provision contained in said agreement

that the defendants should have the management of said corporation and business, and receive the commissions and other benefits provided for in said contract, for the full period of seven years, for which said dividend was guarantied. That, in violation of said agreement, the said plaintiff, on or about the 14th day of April, 1879, procured an action to be brought by the attorney general, in the name of the people of the state, in the supreme court, against said corporation and these defendants, and Benjamin Betts, John A. Leslie, and Amos Rogers, as officers and incorporators thereof, for the dissolution of said corporation. That the action then brought in the name of the people was, in fact, instituted and carried on in the interest and for the benefit of the plaintiff, and was conducted and managed throughout by him and his private counsel, and at his sole expense; and that, shortly after the commencement of this action, the plaintiff was, by an order of the supreme court, duly entered in said action, made a party plaintiff with the people, and thereafter remained a party thereto. That, on or about the 10th day of July, 1879, by an order of the supreme court, made in said action, one Howard P. Moody was appointed the receiver of the said corporation, and thereupon entered upon the performance of his duties as such receiver, and took possession of all the steamers, assets, books, and property of the said corporation. That final judgment was thereafter entered in said action dissolving said corporation and vacating its charter, and all the property and assets were sold or disposed of, and its business wound up and destroyed, all of which matters, acts, and things were done or procured to be done by the said plaintiff, and that, from and after the appointment of said receiver, the defendants were deprived of all and any management or control of said corporation or its business." How far the proceedings just referred to furnish the defendants with a legal excuse for not performing their contract with the plaintiff is the main question to be decided.

For former report, other than those cited in opinion, see 4 N. Y. Supp. 441.

*Glover, Sweezy & Glover* and *Asa B. Gardner*, for plaintiff. *Boardman & Boardman* and *William N. Dykman*, for defendants.

McADAM, J. Former adjudications, made in actions between the same parties, on the identical agreement, have conclusively determined several matters which must now be regarded as authoritatively settled: *First.* That the contract sued upon is valid and enforceable. *Lorillard* v. *Clyde*, 86 N. Y. 384. *Second.* That the defendants were liable upon it, during the time the corporation subsisted *de facto*, although there existed cause for its dissolution. *Same* v. *Same*, 48 N. Y. Super. Ct. 409, affirmed, 99 N. Y. 196, 1 N. E. Rep. 614. *Third.* That separate actions may be brought on the contract as the installments fall due, and separate recoveries had in each. *Same* v. *Same*, 122 N. Y. 41, 25 N. E. Rep. 292. *Fourth.* That the plaintiff was in no legal sense a party to the action by the people of the state, and not concluded by the findings therein. *Same* v. *Same*, 48 N. Y. Super. Ct. 409, 99 N. Y. 196, 1 N. E. Rep. 614, *supra*.

The only phase of the litigation not fully covered by these determinations is the effect of the final dissolution of the corporation upon the rights and liabilities of the parties. In disposing of this issue the nature and purpose of the special agreement sued upon must be kept prominently in view. The contract was made prior to the formation of the corporation, was not merged in it, but was to exist independently of it. It was not an obligation to pay "dividends" technically so called, for that term means a sum which a corporation sets apart from its profits to be divided among its members, (*Lockhart* v. *Van Alstyne*, 31 Mich. 76; *Taft* v. *Railroad Co.*, 8 R. I. 310; Mor. Priv. Corp. § 457;) and no corporation can declare a dividend except from surplus profits, (2 Rev. St., 7th Ed., p. 1364, § 1;) and it is an offense to withdraw

or pay a stockholder any part of the capital stock, (Pen. Code, § 594.) It is evident, therefore, that the term "dividends" was used in the agreement arbitrarily, not in its literal sense, and merely as indicating a profit the plaintiff was to receive, not from the corporation, but from the defendants; for they were to pay the plaintiff the so-called "dividends," whether the corporation made profits or losses, and without regard to the amount of either. The payments were to continue absolutely and at all events for the period of seven years, the promise to pay being the consideration upon which the plaintiff consented to the consolidation, transferred the competing line to the corporation, and yielded its management to the care of the defendants. The plaintiff did all he agreed to do, and the defendants took the responsibility of every contingency that might happen for seven years thereafter.

The plaintiff had the right to assume that the defendants, upon taking control of the corporation, would manage it within the limits of the corporate charter. The power to control certainly implied the duty of managing the trust faithfully and with due regard to the state, as well as the individual rights and interests of all concerned. The defendants must be held to have known that in case of misuser of the corporate franchises, or departure from any of the substantial objects for which the corporation was instituted, it was liable to have its charter annulled at the suit of the state; for, as Justice STORY said in *Terrett* v. *Taylor*, 9 Cranch, 51: "A private corporation may lose its franchises by a misuser of them, and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture. This is the common law of the land, and a tacit condition annexed to the creation of every such corporation." The possibility of forfeiture, depending, as it did, upon the proper management of the corporate affairs by the defendants, was not permitted by the plaintiff to be made a condition upon which the payments promised were to cease, and no such condition can be added now by implication or otherwise. The plaintiff did not rescind the agreement, and brought no action calculated to terminate it, or to absolve the defendants from its complete performance. Suits to determine the forfeiture of corporate franchises must be at the instance and under the authority of the king in England, and of the state in this country. Private individuals have no control of the proceedings, for they are matter of public, and not of private, concern. The provisions regulating such actions are contained in section 1798 of the Code, and the form of judgment is prescribed by section 1801, and there is nothing in either section, or in the procedure, which operates upon or affects the agreement in suit. If it had been an agreement where dividends were to be paid from the earnings of the corporation, it would even then be unnecessary to consider the effect of the judgment dissolving the corporation, for the reason that the want of earnings would be a complete defense in itself, without reference to the cause of their non-existence; but, as before suggested, it is immaterial, under this agreement, whether there were profits or even losses; for without regard to either, or the source from which losses might arise or profits accrue, the plaintiff was to receive from the defendants a sum equal to 7 per cent. upon his capital stock, and this they were to pay absolutely, and without reference to any future possibility. The rule is that, when a party has undertaken absolutely to do a thing, he is not excused from liability by the occurrence of events which render the performance of his promise impossible; or, as BLACKBURN, J., expressed it: "We think it firmly established, both by decided cases and on principle, that where a party has, either expressly or impliedly, undertaken, without any qualification, to do a thing, and does not do it, he must make compensation in damages, though the performance was rendered impracticable by some unforeseen cause over which he had no control." *Ford* v. *Cotesworth*, L. R. 4 Q. B. 134. If a person create a charge upon himself, he is bound thereby, notwithstanding the occurrence of any contingency, because, if he had chosen, he might

have provided against it by the stipulations in his contract. Chitty, Cont. (11th Amer. Ed.) 1074, 1075; 3 Amer. & Eng. Enc. Law, 900.

The claim that the proceeding by the state, which resulted in taking from the defendants the management of the corporation, interfered with their performance of the contract with the plaintiff, is sufficiently answered by the fact that the action of the state was founded solely on the misconduct of the defendants as managing agents. Mor. Priv. Corp. § 1016. The defendants should have foreseen and prevented these consequences. Proper management would have averted them, and rendered state or private interference or loss of control impossible. In this aspect of the case reference may be made to another rule which holds that where performance of a contract is rendered difficult, or even impossible, by the act of the party who is chargeable thereon, such impossibility furnishes him with no defense to an action founded on the obligation. Chitty, Cont. *supra*, § 1079; *Woolner* v. *Hill*, 93 N. Y. 576. The action was brought by the state, and Lorillard was subsequently joined as co-plaintiff by consent. His presence added no force to the proceeding. He did not seek or obtain any personal relief, nor could he receive any in that action. The judgment did not pass on his legal rights under the contract in suit, and nothing was adjudicated against him. The fact that the plaintiff encouraged the state to assert its rights against the defendants, and indemnified it against costs, did not turn that litigation into one of his own. Lorillard could gain no personal advantage by that litigation, and should suffer no pecuniary loss from it. The state was asserting a sovereign right in an action which it alone could maintain, and joining a private individual as co-plaintiff or relator neither impaired nor enlarged the scope of the proceeding. If the litigation had been one calculated to transfer the management of the corporation from the defendants to the plaintiff, or if Lorillard had been joined as defendant, and had, with the other defendants, been adjudged guilty of the wrongs committed, the judgment in that proceeding might have had some significance, but that is not this case. If the plaintiff's contract had been with the corporation, its dissolution might perhaps have terminated it. Corporations are born of the state, and may die by expiration of charter or by annulment or dissolution. At common law the assets of a dissolved corporation reverted to the crown, and the debts due by it were canceled. 2 Kent, Comm. 307; Ang. & A. Corp. 667. The statute changed this inequitable principle by declaring that on the dissolution of a corporation the directors or managers thereof (unless some other person be appointed by the legislature or the court) shall be trustees of the creditors and stockholders, (2 Rev. St., 7th Ed., p. 1531, § 9;) so that, although the corporation may die, its estate is to be administered in practically the same manner as the estate of any natural person. The expiration of the charter does not terminate the corporate existence in such a sense as to prevent an action in the corporate name by its sole surviving director to establish its rights of property for the benefit of stockholders, (*Taylor* v. *Holmes*, 127 U. S. 489, 8 Sup. Ct. Rep. 1192;) nor does a lease to the corporation terminate by its dissolution, (*People* v. *Trust Co.*, 82 N. Y. 283.) The case of *People* v. *Insurance Co.*, 64 How. Pr. 240, affirmed 91 N. Y. 174, was a contract for personal services, which, in its nature, was terminable on the death of either of the contracting parties. See *People* v. *O'Brien*, 111 N. Y. 54, 18 N. E. Rep. 692.

But it is idle to discuss what effect the death of the corporation would have produced if the contract had been made with it, or made dependent on its continued existence. The contract was entered into by the defendants on their own behalf, was not dependent on continued corporate life for vitality or energy, and nothing within the range of possibility excuses its performance. *Beebe* v. *Johnson*, 19 Wend. 500; *Harmony* v. *Bingham*, 12 N. Y. 99; *Booth* v. *Mill Co.*, 60 N. Y. 487. This principle was settled as far back as *Paradine* v. *Jane*, given us by the old reporter, Aleyn, 26, in 23 Car. II.

The defendant there had taken a lease, covenanting to pay rent.    He pleaded that a certain German prince, by the name of Prince Rupert, an alien born, enemy to the king and kingdom, had invaded the realm with a hostile army of men, and with the same force had entered upon the defendant's possessions, and h.m expelled, whereby he could not take the profits.    On demurrer, the court resolved that the matter of the plea was insufficient, and that he ought to pay his rent.    "And this difference," says Aleyn, "was taken: that when the law creates a duty or charge, and the party is disabled to perform it without any default in him, and hath no remedy over, there the law will excuse him. * * * But where a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract."    This was then, has ever since been, and is now the law. The obligation the plaintiff seeks to enforce was not created by the law, but by the voluntary act and contract of the parties, and the strict rule in regard to literal performance is applicable.    A number of cases affirming the principle stated will be found collated in 2 Smith Lead. Cas. (8th Ed.) 39.    If unexpected impediments lie in the way of performance, and a loss must ensue, the law leaves the loss where the contract places it.    If the parties have made no provision for a dispensation, the rule of law gives none.    It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated.    To do otherwise would be to make the construction of the contract depend, not upon the intention of the parties when it was entered into, but upon the incidents of the future. *Vide* Smith, Lead. Cas. *supra*, pp. 40, 41.    The exceptions to the rule are clearly stated in *Dexter* v. *Norton*, 47 N. Y. 64, 65, and apply only where the parties contemplated the continued existence of a particular person or thing which is the subject of the contract, and such person or thing is, without the fault of either party, rendered incapable of answering the purpose of the contract; as in the case of a particular music hall destroyed by fire, (*Taylor* v. *Caldwell*, 3 Best & S. 826:) the sale of a certain horse to be delivered at a future day, and the horse dies in the interval, (Benj. Sales, 424; *Carpenter* v. *Stevens*, 12 Wend. 589;) in the case of an apprentice who became permanently ill, and of a woman who, from illness, was unable to perform as a pianist, (*Boast* v. *Firth*, L. R. 4 C. P. 1; *Robinson* v. *Davison*, L. R. 6 Exch. 269.)    It was unnecessary to guard expressly against these contingencies, for they were excepted by the very nature of the undertaking.    To come within the rule excusing performance, the incapacity to perform must be involuntary, and without fault.    In the cases put, had it appeared that the hall had been destroyed or the horse killed by the negligent act of the promisor, he would have been clearly liable to make good all loss for not furnishing the thing agreed.    So, if the illness of the apprentice or sickness of the pianist had been caused by their own misconduct, neither would have been excused from responding to damages.    The law reasons and acts upon sound logical principles, and considers causes in determining effects, for the legal consequences flowing from one spring may not flow from another.    The case at bar, though near the border line, rests securely on that side which finds recognition in the general rule stated, and does not reach into or invade that domain where the principle illustrated by the exceptions finds application. Here, the destruction of the corporate franchise was the direct result of wrongful conduct on the part of the defendants, in their management of the property intrusted to their care and control.    This circumstance affects largely the legal result of the question submitted for decision.    Suppose the defendants had wrongfully created corporate liabilities, on which judgment had been recovered against the corporation, or had by some neglect allowed the vessels of the line to be libeled, and the management had, in consequence, passed from them to strangers, under execution or marshal's sales of the corpo-

rate property, could it have been seriously contended that such a change in the condition of things would have furnished the defendants with any legal excuse for not performing their contract with the plaintiff? Certainly not. The plaintiff had $150,000 of his capital invested in the enterprise, and apart from the question of stipulated profits, which were incidents merely, he was interested in having the management conducted within the limits of the law, and had the right to call the attention of the state to any infraction of the charter which imperiled his capital, and this without impairing any of his legal rights, remedies, or collateral obligations against those guilty of the wrongs the state attempted to right. The fact that the proceeding was instituted on information imparted by the plaintiff can have no other effect than if the facts communicated had been given by a stranger. The attorney general was charged with a public duty, and how or from whom he obtains the information upon which he acts is matter of little concern, so long as the information proves true, and the proceeding results successfully to the state. Much of the fault found with corporations is their increasing tendency to expand their operations beyond their organic purpose. They are mere creatures of the law, their rights and liabilities are defined by it, and it becomes the duty of the state to keep them within the limits of the powers conferred. A corporation organized to manufacture cannot engage in shipping, banking, insurance, or railroading, nor can corporations chartered for either of these specific purposes engage in enterprises foreign to the object of their creation. Corporations are given especial privileges, not to favor those to whom the franchises are granted, but with a view to the advantages that may accrue to the public, as, in this instance, from facilities afforded for travel and the movement of trade and commerce. The state is, as to domestic rights and corporations, a sovereign power. It may, through want of knowledge of an infraction of its laws, or from indifference, tolerate trivial transgressions, for toleration is not license, but when it is called upon to right a wrong its authority is more far-reaching than many at times contemplate. This attribute of the state is to be exercised whenever the public good requires its interference, and it matters not who awakened it to its sense of duty. The people are the sequestrators, not the informant through whose agency the machinery is put in motion; nor are the motives of the informer of any moment, so long as the end justifies the means, and a legal result is established which approves the action of the state in the premises. Motives can never make that wrong which, in its own essence, is lawful. It may be a misfortune to the defendants that they lost the source from which they expected to realize the moneys promised to the plaintiff, but after the court, in the action to annul the charter, determined that this individual misfortune was necessary to the public good, it is idle to dwell upon this phase of the case with solicitude. The efforts to prove that the plaintiff was a participator in the wrongs adjudicated to have been committed by the defendants have failed, and, as a result, he stands free from whatever legal consequences might have followed if he had been *particeps criminis* with them. There are cases in the books—and among them *Hollingshead* v. *Woodward*, 107 N. Y. 96, 13 N. E. Rep. 621; *Sturges* v. *Vanderbilt*, 73 N. Y. 390; *Mumma* v. *Potomac Co.*, 8 Pet. 281; *Read* v. *Bank*, 23 Me. 321—holding that the dissolution of the corporation is its death; that parties dealing with it contract with reference thereto; that no judgment can thereafter go against it; that a stockholder therein ceases to be such, so far as exemption from corporate penalties is concerned; but a discussion of the reasons for these decisions is unnecessary, because the principles decided do not reach the issue presented by the present record. For the same reason it is unnecessary to consider the rule that, where an act is done by public authority which renders further performance of the contract impossible, the contract is dissolved. *Melville* v. *De Wolf*, 82 E. C. L. 842; *Jones* v. *Judd*, 4 N. Y. 411; *Hildreth* v. *Buell*,

18 Barb. 107. The contract was not made with the corporation, nor was it dependent on its continuation for support. There is no defense to the action, and the plaintiff is entitled to judgment for $33,757.50, the amount claimed, and interest.